B. David Mehmet
130 Church Street
New York, NY 10007
Tele: (212) 920-7602
Fax: (212) 387-9387
Email: David@AppellateTerm.com

Plaintiff Pro Se

**FILED**

2008 MAY 27 P 2: 5 T

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | | |
|---|---|---|
| B. David Mehmet, | ) | Case No. 5:08-cv-01961 (RMW) |
| | ) | |
| Plaintiff, | ) | **NOTICE OF** |
| | ) | **CROSS-MOTION** |
| vs. | ) | |
| | ) | |
| Paypal, Inc. | ) | |
| | ) | DATE:   June 27, 2008 |
| Defendant. | ) | TIME:   9:00 a.m. |
| | ) | CTRM:   6, 4th Floor |
| | ) | JUDGE:  Hon. Ronald M. Whyte |

**PLEASE TAKE NOTICE** that on June 27, 2008, at 9:00 a.m., in Courtroom 6, Fourth Floor of the above entitled Court, located at 280 South 1st Street, San Jose California, and pursuant to Rule 15 and Rule 56 of the Federal Rules of Civil Procedure, the Plaintiff, Pro Se, will move the Court for an order granting partial summary judgment and to amend the Amended Complaint. The grounds for partial summary judgment is that there are no genuine issues of material fact as to the defamation and defamation per se causes of action, and the Plaintiff is entitled to judgment as a matter of law on liability against the Defendant pursuant to Rule 56(d)(2). In support of this cross-motion, the Court is respectfully referred to the accompanying memorandum of points and authorities, Plaintiff's affidavit, and attached exhibits.

Respectfully submitted,

B. David Mehmet

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| B. David Mehmet, | ) |
| | ) |
| Plaintiff, | ) Case No. 5:08-cv-01961 (RMW) |
| | ) |
| vs. | ) |
| | ) **PLAINTIFF AFFIDAVIT** |
| | ) |
| Paypal, Inc. | ) |
| | ) |
| Defendant. | ) |
| | ) |

**B. David Mehmet**, states the following to be true under the penalty of perjury:

1.      That I have personal knowledge of the facts stated herein and I am making the following statements in opposition to the Defendant's motion to dismiss, in support of my cross-motion for partial summary judgment against the Defendant on liability for defamation and defamation per se pursuant to Rule 56(d)(2) of the Fed. R. of Civ. P. and to amend the Amended Complaint, if necessary, pursuant to Rule 15(a)(1) of the Fed. R. of Civ. P. Furthermore, I respectfully request that the Defendant's motion and my cross-motion be made on submission and without oral arguments as it would be a burden on me to travel from the State of New York to California to repeat arguments that are already stated in my opposition and moving papers. At the least, I would respectfully request that oral arguments be scheduled by telephone if the Court deems oral arguments to be necessary. **See proposed Order attached hereto as exhibit "H".**

## **FACTS**

2.      That on April 15, 2008, the initial Complaint was properly served on the Defendant. Thereafter, a Verified Amended Complaint was served on the Defendant pursuant to Rule 15(a)(1) of the Fed. R. of Civ. P. as the Defendant has not answered the initial Complaint. **See a copy of the initial Complaint, Amended Complaint  and certificates of service attached hereto as exhibit "A"**

3.      That the Defendant alleges in its MEMORANDUM OF PONTS AND AUTHORITIES (Hereinafter "memo. of law") in support of its motion to dismiss that I knowingly "failed to rectify" an old balance in a separate account with the Defendant and that this was the reason why the Defendant "suspended" (hereinafter "blocked") my account and froze my funds.

4.      That I had a right by contract with the Defendant to have two accounts with the Defendant.

5.      That contrary to the Defendant's claims, I never opened an account in anyone else's name besides my own. My wife and my mother were doing business with me and we were splitting the profits from a business bank account. They had their own Paypal accounts that were connected to the business bank account.

6.      That I never fabricated any personal information I gave the Defendant in opening any accounts.

7.      That to the best of my knowledge, I never had more then two accounts open at any one time with the Defendant.

8.      That the Defendant intentionally and knowingly developed software features that allows anyone to open additional accounts with the same personal information even if they had a prior account blocked with the same personal information.

9.    That the Defendant has the ability to stop consumers from opening up additional accounts with the same personal information; but the Defendant intentionally and knowing allows anyone to open additional accounts even after their accounts have been blocked. The Defendant now comes into Court complaining about its own business practices and attempting to use its own business practices as a defense to its wrongful conduct against me and other consumers.

10.    That I, my wife and mother were doing business with eBay when the Defendant partnered with eBay and engaged in conduct to force us to use the Defendant's money transfer service by displaying messages on an eBay payment page for our customers that scared our customers by telling them that we did not use the Defendant's money transfer service and that they were at risk for fraud. The Defendant with eBay further placed our customers in fear by telling them on the eBay payment page that if they purchased our products without utilizing the Defendant's money transfer service, our customers would not receive $200 in protection. The Defendant with eBay further forced us to use the Defendant's money transfer service by bundling the Defendant's payment service with eBay's BUY IT NOW fixed price feature. eBay refused to allow us to list any products via the BUY IT NOW feature unless we selected the Defendant's money transfer service as a payment source for our customers.

11.    That I never committed fraud against the Defendant or anyone else, and the Defendant has failed to prove that I have committed fraud.

12.    That contrary to the Defendant's claims that my account was blocked due to my old account, my account was actually automatically blocked by the Defendant's anti-fraud detection software that created a false positive when Eric Anderson transferred $750.00 of the funds I sent him out of the Defendant's pooled bank account and into his personal bank account. The Defendant then, without notice to me, fabricated good cause by defaming me in an August 6, 2007 email to Eric Anderson in explaining why his account was blocked and his funds frozen.

13.    That it was due to the Defendant's fraudulent attempts to avoid bank card fees in collecting the $695.00 from my debit card that caused the negative balance in my old account with the Defendant.[1]

14.    That instead of the Defendant collecting the $695.00 from my debit card as I instructed the Defendant to do, the Defendant intentionally and without authority went directly into my bank account, which was not connected to my debit card, to collect the funds to avoid bank card fees. **See Defendant's boilerplate email and my response attached hereto as exhibit "B".**

15.    That when I briefly reviewed my bank records, I identified that I was charged a large amount of money and the bank records had the Defendant's name, Paypal, noted on the charge. I did not give it a second thought that the charges were overdraft fees nor did I notice it was coming out of my other account. I believed the Defendant had collected its funds.

16.    That I was not aware that the Defendant had submitted multiple attempts to collect the owed funds directly from my bank account instead of from my debit card as I instructed it to do. Nor did I know that it was possible for the Defendant to submit multiple payment requests to my bank on a single transaction that would raise the overdraft fee above and beyond $35.00. Which made me believe that the Defendant had been paid. My bank later informed me that the Defendant intentionally bypassed the bank's security features that blocks identical payment requests. The Defendant did this by cleverly and electronically changing the payment codes on its payment requests to my bank that caused my bank's computer system to treat each payment request from the Defendant as a NEW payment request. So, every time my bank rejected the Defendant's request for payment and noting the rejection as "insufficient funds", the Defendant

---

[1] The Defendant pays no bank fees when it collects funds directly from a bank account. However, the Defendant has to pay bank fees if a credit card or debit card is used to fund a money transfer through its system.

had its software programmed to change the payment code and resubmit it to my bank. In turn, my bank charged me an overdraft fee for each and every payment request received from the Defendant for that single transaction.

17.    That my bank informed me that this practice engaged by the Defendant in bypassing the bank's security systems makes it impossible for the bank to stop the Defendant from causing multiple overdraft fees on a single transaction nor to prevent the Defendant from collecting funds from consumers' bank accounts even when the consumers place a bank stop on the funds. Which Placed me and millions of consumers in serious danger from having money withdrawn from our bank accounts by fraudsters utilizing the Defendant's money transfer service even when we placed a bank stop payment on a suspected fraudulent transaction. And because the Defendant was wrongly bypassing consumers' credit cards, and going directly into their accounts without authorization, consumers were wrongly losing fraud protection via their credit cards and losing the ability to initiate a charge back.

18.    That I have uncovered, so far, that the Defendant caused me to suffer over $1,000 in overdraft fees. After reviewing my past bank records for this lawsuit, I uncovered that this was not the first time that the Defendant wrongly went into my bank account when I specifically instructed it to use my debit card. Nor was I the only consumer that the Defendant perpetrated this wrongful conduct against. In a separate and single transaction, I uncovered that the Defendant caused me to be charged over $500.00 in overdraft fees by its deliberate bypassing of my bank's security system to submit multiple payment requests. Therefore, the Defendant is liable to me for over $1,000 in overdraft fees alone and no money is owed to the Defendant on the old account due to its wrongful conduct in bypassing my bank's security systems in its attempt to avoid bank card fees it would have sustained if it used my debit card.

19.    That in 2005, 28 U.S. Attorney Generals around the United States sued the Defendant and alleged that the Defendant had quote: "**problems with account settings dealing with source of funding that resulted in monies being withdrawn from Defendant Paypal's members' bank account although other payment sources were preferred**" Unquote. In 2006, the Defendant paid $5.2 Million to settle the lawsuit with the Attorney Generals and agreed to refrain from wrongfully collecting funds from a consumer's bank account when another payment source was to be used. However, the Defendant violated its settlement agreement of 2006 with the Attorney Generals when it went into my bank account instead of using my debit card as I instructed it to do.

20.    That upon information and belief, the Defendant had already sold its right to the $695.00 debt in the old account to a collection agency prior to it sending the August 6, 2007 email to my business associate, Eric Anderson, which falsely claimed that my funds were fraudulent. Thus, the Defendant had no standing to claim any rights to the $695.00 debt. Therefore, the Defendant has misrepresented to this Court that its actions in defaming me to Eric Anderson was due to the debt in the old account, which makes no sense since the debt does not equate to fraud.

21.    That in and around 2006 and 2007, I co-produced two TV commercials with Mann Productions in California, and I was in the process of producing my film "The Ultimate Hit" (www.TheUltimateHit.com) until the Defendant defamed me to Eric Anderson, which prevented me from obtaining the financing I needed and caused me to lose a distribution contract with Carmike Cinema, Inc.

22.    That on August 6, 2007, the Defendant sent Eric Anderson an email that contained the subject: **"Re: Protections/Privacy/Security (Routing Code: C840-L001-Q414-T3335-S111): kd2 (KMM78622196LOKM)"**.

23.    That the Defendant's August 6, 2007 email to Eric Anderson identified above contained the following statement quote: **"We received notification that the funds in question used for this transaction were possibly fraudulent. We did an investigation and it was determined that the funds, indeed, were fraudulent. As such, we had to return the funds to the party that had them taken from them without their authorization"** unquote<ins>. **See sworn statement and emails from Eric Anderson attached hereto as exhibit "C"**</ins>[2]

24.    That the Amended Complaint identifies damages of $1,600.000.00 resulting from the lost contracts pertaining to the production and distribution of my film, which is in addition to the lost $250,000 investment from my investor, Bahia M. Bin Chambi. I have attached here an affidavit from my investor, and I have also attached business email dated July 25, 2007 between myself and Mr. Michael Burks witnessing that I had an investor to produce my film. **See investor's affidavit and business email attached hereto as exhibit "D"**.

25.    In reference to my contract with Mr. Eric Anderson, the Defendant fails to correctly calculate the true value of the contract. The Defendant merely calculates the value of the contract as to its terms and fails to calculate the loss of revenue and profits from the fruits of the contract, which was the film treatment. The film treatment was worth $250,000 from the investor and over $1,600,000.00 in lost revenue from Carmike Cinema, Inc., which includes $330,500.00 in profits to me.

26.    That I have been absolutely humiliated and embarrassed by the Defendant's defamatory email to Eric Anderson. These people work with big film studios like Disney and MGM, and who talk to each other and pass information to each other. **See business emails from Mr.**

---

[2] Mr. Eric Anderson is an accomplished writer. He recently wrote and directed the documentary "Red, White & Blue: A Tale of Two Americas" that pertains to the divide between red and blue States in the past presidential election campaign and the current state of the Country.

**Burks attached hereto as exhibit "E".** Which puts me in serious danger of Mr Anderson and Mr. Burks passing on information to other film executives that I am a fraudster, and which would completely destroy any opportunity I have to make it in the film industry. In fact, Mr. Burks had so much confidence in me that he was having me work with him on another film project called "REDEEMED" that the actor James Purefoy and the movie producer Tom Reeves committed themselves to. Any reasonable person, as those people who will make up the jury at trial, can conclude that my feelings of humiliation, outrage and extreme distress from the Defendant's defamatory email is a reasonable reaction and foreseeable in such a situation. **See letters of intent from James Purefoy and Tom Reeves attached hereto as exhibit "F".** [3]

27. The Defendant has failed to send Mr. Anderson a retraction of its defamatory statements against me in its August 6, 2007 email. I am absolutely outraged, emotionally distraught and I have suffered extreme emotional distress over this situation because as witnessed by Mr. Anderson's recent replies to me, which I have attached here, he has no respect for me any longer and he uses profanity when speaking to me now when he never did. It is clear that Mr. Anderson believes that I'm a fraudster due to the Defendant's email adamantly informing him that it conducted an investigation, which concluded that my funds were fraudulent and that I stole the money from a third party. Also, it is NOT unreasonable to believe that a recipient of the Defendant's email accusing me of a crime may file a criminal complaint against me with a law enforcement agency. **See my contract with Eric Anderson attached hereto as exhibit "G".**

28. That if this Court determines that my Amended Complaint is deficit in its pleadings to warrant a dismissal; but that a further amendment of the Complaint can correct the deficiency, I respectfully request that I be granted an opportunity to further amend the complaint and that such

---

[3] Tom Reeves produced and co-produced very successful major motion pictures. For example, he co-produced the movie "The Musketeer" staring Tim Roth, Mena Suvari, Stephen Rea, and Bill Treacher among others who are major actors engrained in the film industry. The Defendant's defamatory statements against me also threatened my standing with these people .

deficiency be thoroughly identified to enable me to properly correct the deficiency within a second amended complaint.

29.    That no other motion requesting the relief herein has been previously filed with this Court.

**Wherefore,** I pry for an order denying the Defendant's motion to dismiss, granting my request to amend the amended complaint, if it is not deemed a moot issue, and granting my cross-motion for partial summary judgment on liability for defamation and defamation per se, costs and for such other and further relief as this court deems just and proper. I respectfully request that any arguments and determination on damages be held in abeyance until trial.

Dated; New York, NY
     May 19th, 2008

 

B. David Mehmet
Plaintiff Pro Se


ON THIS _____ 12th _____ DAY OF MAY IN THE YEAR OF 2008, THE ABOVE SIGNED PERSON BADISSE DAVID MEMET PERSONALLY KNOWN, WHO, BEING DULY SWORN, DID EXECUTE THE FOREGOING AFFIDAVIT AND DID SO AS HIS FREE ACT AND DEED. IN WITNESS WHEREOF, I HEREUNTO SET MY HAND AND OFFICIAL SEAL

NOTARY

JEAN-PAUL GRECZI
Notary Public, State of New York
No. 01GR6119330
Qualified in Queens County
Commission Expires November 29, 2008



B. David Mehmet
130 Church Street
New York, NY 10007
Tele: (212)920-7602
Fax:  (212)387-9387
Email: David @appellateterm.com

**ORIGINAL**
**FILED**

08 APR 28  AM 9: 48

**RICHARD W. WIEKING**
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA S.J.

# UNITED STATES DISTRICT COURT
## *NORTHERN*   DISTRICT OF CALIFORNIA

| | |
|---|---|
| B. David Mehmet | CASE NUMBER: |
| Plaintiff(s) | C0801961 RS |
| v. | |
| Paypal, Inc. | **PROOF OF SERVICE** |
| | **SUMMONS AND COMPLAINT** |
| Defendant(s) | (Use separate proof of service for each person/party served) |

1.  At the time of service I was at least 18 years of age and not a party to this action and I served copies of the *(specify documents)*:

   a.  ☒ summons     ☒ complaint     ☐ alias summons     ☐ first amended complaint
   ☐ second amended complaint
   ☐ third amended complaint

   ☒ other *(specify)*: ORDER SETTING INITIAL CASE MANAGEMENT & CONFERENCE AND ADR *DEADLINES;*
   *NOTICE OF ASSIGNMENT OF CASE TO A U.S. MAGISTRATE JUDGE; CIVIL*
   *COVER SHEET; ADR RESOLUTION PROCEDURES*

2.  Person served:

   a.  ☒ Defendant *(name)*: PAYPAL, INC.

   b.  ☐ Other *(specify name and title or relationship to the party/business named)*:
   **BY SERVING NATIONAL REGISTERED AGENTS, INC., REP. DENA LAPORTA

   c.  ☒ Address where papers were served: 2030 MAIN STREET, #1030, IRVINE, CA 92614

3.  Manner of Service in compliance with *(the appropriate box must be checked)*:

   a.  ☐ Federal Rules of Civil Procedure

   b.  ☒ California Code of Civil Procedure

4.  I served the person named in Item 2:

   a.  ☒ By Personal service. By personally delivering copies. If the person is a minor, by leaving copies with a parent, guardian, conservator or similar fiduciary and to the minor if at least twelve (12) years of age.

   1.  ☒ Papers were served on *(date)*:  4/15/08     at *(time)*:  3:20PM

   b.  ☐ By Substituted service. By leaving copies:

   1.  ☐ (home) at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household, at least 18 years of age, who was informed of the general nature of the papers.

   2.  ☐ (business) or a person apparently in charge of the office or place of business, at least 18 years of age, who was informed of the general nature of the papers.

   3.  ☐ Papers were served on *(date)*: _____ at *(time)*: _____

   4.  ☐ by mailing *(by first-class mail, postage prepaid)* copies to the person served in Item 2(b) at the place where the copies were left in Item.2(c).

   5.  ☐ papers were mailed on (date): _____

   6.  ☐ due diligence. I made at least three (3) attempts to personally serve the defendant.

---

**PROOF OF SERVICE - SUMMONS AND COMPLAINT**

CV-1 (04/01)                                                                                                     PAGE 1

c.  ☐  **Mail and acknowledgment of service.** By mailing *(by first-class mail or airmail, postage prepaid)* copies to the person served, with two (2) copies of the form of Waiver of Service of Summons and Complaint and a return envelope, postage prepaid addressed to the sender. **(Attach completed Waiver of Service of Summons and Complaint).**

d.  ☐  **Service on domestic corporation, unincorporated association (including partnership), or public entity. (F.R.Civ.P. 4(h)) (C.C.P. 416.10)** By delivering, during usual business hours, a copy of the summons and complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute and the statute so requires, by also mailing, by first-class mail, postage prepaid, a copy to the defendant.

e.  ☐  **Substituted service on domestic corporation, unincorporated association (including partnership), or public entity. (C.C.P. 415.20 only)** By leaving during usual office hours, a copy of the summons and complaint in the office of the person served with the person who apparently was in charge and thereafter by mailing *(by first-class mail, postage prepaid)* copies to the persons at the place where the copies were left in full compliance with C.C.P. 415.20. Substitute service upon the California Secretary of State requires a court order. **(Attach a copy of the order to this Proof of Service).**

f.  ☐  **Service on a foreign corporation.** In any manner prescribed for individuals by FRCP 4(f).

g.  ☐  **Certified or registered mail service.** By mailing to an address outside California *(by first-class mail, postage prepaid, requiring a return receipt)* copies to the person served. **(Attach signed return receipt or other evidence of actual receipt by the person served).**

h.  ☐  **Other** (specify code section and type of service):

5.  **Service upon the United States, and Its Agencies, Corporations or Officers.**

a.  ☐  by delivering a copy of the summons and complaint to the clerical employee designated by the U.S. Attorney authorized to accept service, pursuant to the procedures for the Office of the U.S. Attorney for acceptance of service, or by sending a copy of the summons and complaint by registered or certified mail addressed to the civil process clerk at the U.S. Attorneys Office.

Name of person served: _____

Title of person served: _____

Date and time of service: *(date):* _____ at *(time):* _____

b.  ☐  By sending a copy of the summons and complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. **(Attach signed return receipt or other evidence of actual receipt by the person served).**

c.  ☐  By sending a copy of the summons and complaint by registered or certified mail to the officer, agency or corporation **(Attach signed return receipt or other evidence of actual receipt by the person served).**

6.  At the time of service I was at least 18 years of age and not a party to this action.

7.  Person serving *(name, address and telephone number):*

    WENDY DUFFIELD
    ALL AMERICAN ATTORNEY SERVICE, INC.
    714 W. OLYMPIC BLVD. #639
    LOS ANGELES, CA 90015
    (213) 746-8010

    a.  Fee for service: $ 150.00

    b.  ☐  Not a registered California process server

    c.  ☐  Exempt from registration under B&P 22350(b)

    d.  ☒  Registered California process server

8.  ☐  I am a California sheriff, marshal, or constable and I certify that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 4/21/08

_____
*(Signature)*

AO 440 (Rev. 03/08) Civil Summons

# UNITED STATES DISTRICT COURT
### for the

### Northern District of California

B. David Mehmet

_____
Plaintiff

v.

Pay Pal, Inc.

_____
Defendant

)
)
)
)
)

ADR

Civil Action No.

**C08 01961** RS

Summons in a Civil Action

To:     Pay pal, Inc.
        _____
        *(Defendant's name)*

A lawsuit has been filed against you.

Within **30** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, whose name and address are:

B. David Mehmet
130 Church Street, Ste 251
New York, NY 10007

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __4/03/08__

Richard W. Wieking
Name of clerk of court

Deputy clerk's signature
Tiffany Salinas-Harwell

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

B. David Mehmet
130 Church Street
New York, NY 10007
Tele (212) 920-7602
Fax (212) 387-9387
Email David@AppellateTerm.com

Plaintiff

**ORIGINAL
FILED**

08 APR 14 PM 3: 11

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA S.J.

ADR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| B. David Mehmet, | ) |
| Plaintiff | ) |
| | ) **C08  01961** |
| vs. | ) Case No _____ |
| | ) COMPLAINT |
| Paypal, Inc. | ) **DEMAND FOR JURY TRIAL** |
| Defendant. | ) |

RS

1    **Original Jurisdiction**.   This court has original jurisdiction over this complaint pursuant 28 U.S.C 1332 as the amount in dispute exceeds SEVENTY FIVE THOUSAND DOLLARS ($75 000 00) and the defendant holds residence in California while the Plaintiff holds residence in New York

2.    **Venue**  Venue is appropriate in this court pursuant to 28 U.S.C. 1391 because the defendant resides within the County of San Jose, California.

3.    **Intradistrict Assignment.** This lawsuit should be assigned to the San Jose Division of this Court because the parties agreed to this Division within their contract.

# FACTS

### Defendant Blocked Plaintiff's Account and Froze his Funds without GOOD CAUSE

4.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 4 with the same force and effect as if more fully set forth herein.

5.    That the Defendant operates an Internet based website at www.Paypal.com that transfers money from one person to another person over the Internet (Hereinafter "money transfer service").

6.    That the Plaintiff used the Defendant's money transfer service to send SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) to Eric Anderson.

7.    That the Defendant obtained the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) by electronically withdrawing funds from the Plaintiff's bank account at Wachovia bank on or about July 25, 2007 by utilizing the Plaintiff's debit card, which had the following four last digits ...9024.

7.    That the Defendant blocked the Plaintiff's account after he paid Eric Anderson SEVEN HUNDRED AND FIFTY DOLLARS ($750.00).

8.    That the Defendant blocked the account of Eric Anderson after the Plaintiff paid Eric Anderson SEVEN HUNDRED AND FIFTY DOLLARS ($750.00).

9.    That the Defendant blocked the account of Eric Anderson after Eric Anderson transferred the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) to his bank account.

10.    That the Defendant deducted an additional SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) from Eric Anderson's account located at www.Paypal.com after Eric Anderson transferred SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) to his bank account.

11.    That the Defendant demanded that Eric Anderson repay the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) he transferred into his bank account.

### Defendant Falsely Accused the Plaintiff of Fraud

12.    That on August 6, 2007, the Defendant sent Eric Anderson an email that stated quote: **"We received notification that the funds in question used for this transaction were possibly fraudulent. We did an investigation and it was determined that the funds, indeed, were fraudulent. As such, we had to return the funds to the party that had them taken from them without their authorization."**

13.    That the Defendant's email dated August 6, 2007 to Eric Anderson noted in paragraph 12 above was referring to the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) the Plaintiff paid to Eric Anderson through the Defendant's money transfer service.

14.    That the Defendant's email dated August 6, 2007 noted in paragraph 12 above was referring to the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) the Defendant electronically withdrew from the Plaintiff's bank account at Wachovia bank.

15.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it conducted an "investigation", the Defendant DID NOT conduct an investigation on the SEVEN HUNDRED AND FIFTY DOLLAR.($750.00) payment to Eric Anderson prior to sending Eric Anderson that email.

16.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that the Plaintiff's SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) payment to Eric Anderson was "fraudulent", it was not.

17.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it had to return the Plaintiff's SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) **"to the party that had them taken from them without their authorization"**, there was no other party that had SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) taken from them by the Plaintiff.

18.    That on or about July 25, 2007, the Defendant withheld a total of ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) from the Plaintiff.

19.    That the SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) payment to Eric Anderson was part of the ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) being withheld by the Defendant on or about July 25, 2007.

20.    That on or about July 25, 2007, the Plaintiff demanded the Defendant return the ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) to him and the Defendant refused.

21.    That the Defendant did return the ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) after the Plaintiff filed a lawsuit against it in New York on August 1, 2007.

22.    That the Defendant DID NOT pay the Plaintiff the interest earned on his ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) that was deposited into the Defendant's pooled account.

23.    That in returning the Plaintiff's ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00), the Defendant admitted that the SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) payment to Eric Anderson was a lawful transaction.

24.    That in returning the Plaintiff's ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00), the Defendant admitted that it had no knowledge that there was another "party" that had SEVEN HUNDRED AND FIFTY DOLLAR ($750.00) taken from them by the Plaintiff.

25.    That in returning the Plaintiff's ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00), the Defendant admitted that the August 6, 2007 email sent to Eric Anderson contained false statements.

26.    That the Defendant defamed the Plaintiff in its August 6, 2007 email to Eric Anderson.

27.    That Eric Anderson uploaded a copy of a contact between the Plaintiff and himself to the Defendant's website at www.Paypal.com prior to the Defendant returning the SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) to the Plaintiff.

28.    That due to the Defendant's false statements to Eric Anderson within its August 6, 2007 email, Eric Anderson terminated a contract with the Plaintiff and demanded that the Plaintiff pay him the total amount of EIGHTEEN THOUSAND FIVE HUNDRED AND THIRTY EIGHT DOLLARS ($18,538.00) for his services, which was SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00) above and beyond the contract terms, which the Plaintiff could not afford.

29.    That due to Eric Anderson terminating his contract with the Plaintiff, the Plaintiff lost another contract with **Carmike Cinemas, Inc**. who were going to exhibit a film in 600-1,000 movie screens across the United States, which film was to be produced by the Plaintiff. Thus, the Plaintiff has lost future income estimated in the hundreds of thousands of dollars from the inability to exhibit his film.

**Defendant Concealed a Vital Material Fact**

30.    That the Plaintiff agreed to the Defendant's user agreement prior to August 1, 2007.

31.    That the Defendant did represent to the Plaintiff within its contract that it would not interfere with the Plaintiff's money transfers via its website located at www.Paypal.com without good cause.

32.    That the Defendant did represent to the Plaintiff within paragraph ten (10) of its contract that it would not interfere with the Plaintiff's money transfers via its website located at www.Paypal.com unless the Plaintiff violated paragraph nine (9) of the contract entitled "Restrictive Activities".

33.    That the Plaintiff was not in violation of the Defendant's contract when the Defendant blocked his account. Specifically, the Plaintiff did not committed fraud as the Defendant claimed in its August 6, 2008 email to Eric Anderson.

34.    That the Defendant did not place the Plaintiff on notice of any violation prior to blocking his account and withholding ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) of Plaintiff's money.

35.    That the Defendant had knowingly and intentionally concealed vital **material facts** from the Plaintiff concerning false positives produced by its anti-fraud detection software when the Plaintiff entered into contract with the Defendant.

36.    That Plaintiff's ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) was withheld by the Plaintiff because its anti-fraud detection software produced a false positive.

37.    That the Defendant's anti-fraud detection software produced a false positive because Eric Anderson transferred Plaintiff's SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) out of the Defendant's pooled bank account and into his own bank account soon after the Plaintiff made the payment.

38.    That the Defendant has inserted filters in its anti-fraud detection software that blocks its member's accounts when there is an immediate transfer of monies from its pooled bank accounts to another bank account that is not controlled by the Defendant after a transaction between its members has concluded.

39.    That in justifying its actions in blocking member's accounts, the Defendant emails its members messages containing false reasons why their accounts are being blocked.

40.    That many of the emails the Defendant sends to its members contains defamatory and inflammatory wording that causes members to rise against each other and motivates the increase of complaints and requests for refunds, which in turn allows the Defendant to freeze member's funds for up to six months while collecting interest on the funds.

41.    That in the worst case, the Defendant's defamatory and inflammatory emails caused a number of members to turn against each other that ended in two people being falsely arrested and charged with Felony Internet Fraud. Sara Holland, a single mother of three and a volunteer firefighter, was falsely arrested due the Defendant's email accusing her of fraud, which is a similar false accusation found in the Defendant's August 6, 2007 email to Eric Anderson. Matt Miller, who works for homeland security, was also arrested when one of his clients filed a criminal complaint against him after receiving Defendant's defamatory and inflammatory email that also accused him of fraud.

42.    That on July 31, 2007, after the Plaintiff's account with the Defendant was blocked and his funds withheld; but before the New York lawsuit was filed, the Plaintiff called the

Defendant's customer service department and spoke to an employee of the Defendant named "Rene". The Defendant's customer service representative informed the Plaintiff that his account was blocked by their anti-fraud detection software and that there was a limited amount of employees who review blocked accounts to identify false positives, which would result in the release of the Plaintiff's account. The Defendant's customer service representative then informed the Plaintiff that his account was blocked due to an old account, which had a debit of SIX HUNDRED AND NINTY FIVE DOLLARS ($695.00). This explanation was not only devoid of any proof of such debt; but contradicted the Defendant's statements to Eric Anderson in its email dated August 6, 2007 that stated the Plaintiff had defrauded someone.

43.     That due to the inability of the Defendant's anti-fraud detection Software to determine whether the Plaintiff's payment to Eric Anderson was legal or illegal, it created a false positive, which severely damaged the Plaintiff.

44.     That the Defendant had failed to inform the Plaintiff of the existence of false positives and the danger associated with them. Instead, the Defendant intentionally concealed this vital material fact from the Plaintiff to induce him to enter into contract with it and to use its money transfer service without restrain.

45.     That if the Defendant disclosed the fact about false positives, the Plaintiff would have never used the Defendant's money transfer service to pay Eric Anderson. Nor would the Plaintiff have allowed the Defendant to withdraw ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) from his Wachoiva bank account.

46.     That the Defendant has joined teams with its controlling company, eBay, and together they have made it mandatory to use the Defendant's money transfer service on eBay. In addition, many other Internet services only use the Defendant's money transfer services with no alternative method of paying, which forces a person to use the Defendant's money transfer

services. However, with the knowledge of false positives, a person has the control to protect themselves from great financial loss by not risking large amounts of money with the Defendant.

## Defendant's Continued Misconduct against Consumers

47.    That the Defendant has a history of bad conduct in harming consumers and having a disregard for the law to further its own profit agenda over the well-being of California consumers and all consumers Worldwide.

48.    That the Defendant was sued in 2002 under caption **Comb, et al vs. Paypal, Inc**. **docket 02-1227** within The United States District Court for the Northern District of California. The complaint alleged that because the Defendant "**exceeded its operational capacity**" it was "**unable to maintain and manage accounts in a manner required by applicable state and federal legislation**." And the Defendant refused "**to provide details or explanations with respect to its investigations**" of frozen accounts. In addition, the Complaint alleged that when consumers where able to contact the Defendant's **"representatives, the representatives are combative and rude, refuse to answer specific questions, hang up in the middle of phone calls, provide "canned" responses to individualized problems, require customers to fax information while providing inoperative fax numbers, and refuse to allow customers to speak to managers."** Judge Fogel, who presided over this lawsuit, issued a ruling that stated "**the Court concludes that the User Agreement and arbitration clause are substantively unconscionable**"

49.    That again, in 2004, the Defendant was sued this time by New York State's Attorney General, Eliot Spitzer, who alleged that the Defendant's User Agreement "**misrepresented certain terms and conditions to its members, which included statements that it provided its**

members **"the rights and privileges expected of a credit card transaction. In fact, members were often denied these rights by the Defendant**."

50.     That yet again, in 2005, the Defendant was sued in a class action lawsuit by 28 Attorney generals from Alabama, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Vermont, Washington and West Virginia. The 28 Attorney Generals accused the Defendant of "**hidden fees, misrepresentations, as well as problems with account settings dealing with source of funding that resulted in monies being withdrawn from Defendant Paypal's members' bank account although other payment sources were preferred."**

51.     That yet again, the Defendant was sued in a class action lawsuit in 2005 within the United States District Court Eastern District of New York under caption ***Mike Steele, et al vs. Paypal and Essex Technology Group, Inc***. **docket 05-01720** based on allegations of "**deceptive trade practices, fraudulent inducement, misrepresentation and breach of contract."**

52     That although the Defendant has been sued multiple times in addition to the above lawsuits, the Defendant continues to engage in bad conduct against its consumers in an effort to increase its flow of profits. The Defendant has taken the stance that these lawsuits against it are just a **part of doing business**, and the Defendant resolved each of the lawsuits out of court to then only continue its bad conduct. For example, as shocking and unbelievable as it may sound, the Defendant's concealment of false positives and the danger associated with them, caused Matt Miller in 2004 and Sarah Holland in 2007 to be falsely arrested and charged with felony internet fraud.

53.    That Sarah Holland is a single mother of three and was a firefighter until she lost her job due to the Defendant's false positives. Matt Miller is a firefighter in the next town from Ms. Holland and also works for Homeland Security. Due to the false positives that sent out computer generated emails to Ms. Holland's and Mr. Miller's police officer clients containing the words "suspicion of fraud", "suspicious activities" and "fraud", their police officer clients had them arrested and charged with Felony Internet Fraud.

## FIRST CAUSE OF ACTION
(Fraudulent Misrepresentation)

54.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 53 with the same force and effect as if more fully set forth herein.

55.    That the Defendant made representations to the Plaintiff within its contract that if the Plaintiff utilized its services to make payments to third-parties, the Defendant would forward the funds to such third-parties and would not wrongly interfere with such payments unless the Plaintiff violated paragraph 9 of the contract entitled "**Restricted Activities**".

56.    That the Defendant intended the Plaintiff to have reliance on its representation within its contract when the Plaintiff agreed to its terms.

57.    That in reliance of Defendant's representations, the Plaintiff utilized the Defendant's service to send funds to third-parties.

58.    That contrary to Defendant's assurance that it would not wrongly interfere with Plaintiff's fund transfers, the Defendant on or about July 25, 2007 did wrongly withhold Plaintiff's funds and had wrongly refused to release the funds to the Plaintiff after the Plaintiff requested that the Defendant release his funds.

59.    That the Plaintiff did not violate the Defendant's contract nor did the Plaintiff commit fraud.

60.    That the Defendant had no intentions of honoring its representations to the Plaintiff.

61.    That the Defendant represented to the Plaintiff that if he provided additional verification, the Defendant would release his funds.

62.    That the Plaintiff, having reliance on the Defendant's statements, provided the additional verification requested by the Defendant.

63.    That once again, the Defendant had no intentions of honoring its representations to the Plaintiff.

64.    That after the Plaintiff provided the Defendant with the requested verification; the Defendant did fail to release the Plaintiff's funds and had continued to refuse to release such funds to the Plaintiff.

65.    That once the Plaintiff filed this action against the Defendant, the Defendant deposited the Plaintiff's funds into his bank account at Wachovia Bank via the Plaintiff's debit card ending in …9024.

66.    That the Defendant has wrongly converted the interest earned from the Plaintiffs money within the Defendant's pooled account to its own use.

67.    That at the time the Defendant had entered into contract with the Plaintiff, it had knowledge that it's anti-fraud detection software could create a false positive against the Plaintiff and interfere with Plaintiff's fund transfers; but the Defendant intentionally and maliciously failed to disclose this fact to the Plaintiff to induce him to enter into contract with it.

68.    That the Defendant's anti-fraud detection software did create a false positive and did interfere with Plaintiffs funds by blocking Plaintiff's account and freezing his funds with the Defendant and refusing to forward the funds to his business associate.

69.    That due to the Defendant's fraud, the Plaintiff has suffered economic and emotional damages.

70.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).


## SECOND CAUSE OF ACTION
(Fraudulent Concealment)

71.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 70 with the same force and effect as if more fully set forth herein.

72.    That the Defendant did represent to the Plaintiff within its contract that it would not interfere with the Plaintiff's fund transfers without good cause.

73.    That the Defendant had knowledge of the falsity of its representations within its contract that it would not interfere with the Plaintiff's fund transfers without good cause.

74.    That the Defendant did intentionally and maliciously conceal material facts concerning false positives from the Plaintiff, which could have and did interfere with the Plaintiff's fund transfers without good cause.

75.    That the Plaintiff had reliance on the Defendant's representations due to its well-known and dominant position within the market.

76.    That due to the Defendant's concealment of false positives, the Plaintiff was severely harmed.

77.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

78.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 77 with the same force and effect as if more fully set forth herein.

79.    That the Defendant did represent to the Plaintiff within its contract that it would not interfere with the Plaintiff's fund transfers without good cause.

80.    That the Defendant had knowledge of the falsity of its representations within its contract that it would not interfere with the Plaintiff's fund transfers without good cause.

81.    That the Defendant did intentionally and maliciously conceal material facts concerning false positives from the Plaintiff for the purpose of inducing the Plaintiff to enter into contract with it.

82.    That the Plaintiff had reliance on the Defendant's representations due to its well-known and dominant position within the market.

83.    That due to the Defendant's concealment of false positives, the Plaintiff was severely harmed.

84.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).


## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

85.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 84 with the same force and effect as if more fully set forth herein.

86.    That the Defendant had a duty to disclose the fact about the false positives and the dangers associated with them to the Plaintiff prior to him entering into contract with the Defendant.

87.    That the Defendant made a false representation within its contract pertaining to its interference with the Plaintiff's fund transfers that it should have known was incorrect because the dangers associated with false positives could have and did cause the Plaintiff's account with the Defendant to be blocked without good cause, his funds frozen and a computer generated email was sent to the Plaintiff's business associate claiming he was under investigation for fraud, which was followed by a second email to the Plaintiff's business associate claiming that the Plaintiff did "in deed" commit fraud.

88.    That the Defendant had knowledge that the representations made within its contract would be relied on by the Plaintiff in deciding to enter into contract with it.

89.    That the Plaintiff did have reliance on the representations made in the Defendant's contract, which caused him to enter into contract with the Defendant.

90.    That due to the Plaintiff's reliance on the Defendant's false representation within its contract, the Plaintiff was prevented from taking steps to protect himself and was eventually harmed.

91.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## FIFTH CAUSE OF ACTION
(Defamation)

92.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 91 with the same force and effect as if more fully set forth herein.

93.    That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone.

94.    That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone for the purpose of creating good cause for blocking Plaintiff's account and freezing his funds.

95.    That the Defendant knew at the time it made such statements to Eric Anderson that those statements were false.

96.    That the Defendant did, with intent and malice, make false statements to Eric Anderson with full knowledge that the Plaintiff would be defamed and his reputation would be damaged.

97.    That the Defendant did make false statements to Eric Anderson with reckless disregard as to the truth of the statements and whether the statements defamed the Plaintiff.

98.    That Eric Anderson did have reliance on the Defendant's statements due to its well-known and dominant position within the market.

99.    That due to the Defendant's false statements to Eric Anderson, the Plaintiff was severely harmed when he lost the benefits of a contract with Eric Anderson valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00), which also caused him to lose a second and more valuable contract with Carmike Cinemas, Inc.

100.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SIXTH CAUSE OF ACTION
(Defamation Per Se)

101.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 100 with the same force and effect as if more fully set forth herein.

102.    That the Defendant made intentional, malicious and defamatory statements against the Plaintiff to Eric Anderson that the Plaintiff defrauded someone.

103.    That the Defendant knew, at the time it made the statements to Eric Anderson, they were false.

104.    That the Defendant did, with intent, make such false statements to Eric Anderson in its attempt to create good cause for blocking Plaintiff's account and freezing his funds.

105.    That  the Defendant did act negligently in failing to learn whether the statements made to Eric Anderson were false and defamed the Plaintiff prior to making such statements.

106.    That due to the Defendant's false statements to Eric Anderson, the Plaintiff was severely harmed when he lost the benefits of a contract with Eric Anderson valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00), which also caused him to lose a second and more valuable contract with Carmike Cinemas, Inc.

107.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).


## SEVENTH CAUSE OF ACTION
(Conversion)

108.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 107 with the same force and effect as if more fully set forth herein.

109.    That the Defendant did wrongly gain possession of Plaintiff's funds.

110.   That the Defendant did wrongly refuse to forward Plaintiff's funds to Plaintiff's business associate.

111.   That the Defendant did wrongly refuse to return Plaintiff's funds after Plaintiff requested such funds from the Defendant.

112.   That the Defendant Paypal did wrongly convert Plaintiff's interest to its own use.

113.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).


## EIGHT CAUSE OF ACTION
### (Tortious Interference with Business Relationship)

114.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 113 with the same force and effect as if more fully set forth herein.

115.   That the Plaintiff did have an economic relationship with his business associate giving him a benefit valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00).

116.   That the Defendant did have knowledge of the economic relationship between the Plaintiff and his business associate.

117.   That the Defendant did with intent and malice interfere with Plaintiff's business relationship with his business associate.

118.   That the Defendant did with reckless disregard interfere with Plaintiff's business relationship with his business associate.

119.   That due to the Defendant's interference, the Plaintiff's business relationship with his business associate was terminated.

120.    That due to the Defendant's interference with the Plaintiff's business relationship with his business associate, the Plaintiff was severely harmed when he lost the benefits of a contract with his business associate valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00), which also caused him to lose a second and more valuable contract with Carmike Cinemas, Inc.

121.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## NINTH CAUSE OF ACTION
(Violation of Cal. Bus. Prof. Code §§ 17200
Unlawful, Unfair and Fraudulent Business Practices)

122.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 121 with the same force and effect as if more fully set forth herein

123.    That the Defendant's false representations within its contract pertaining to its interference of Plaintiff's fund transfers and its concealment of a material fact concerning false positives, which were meant to induce the Plaintiff to enter into contract with it constitutes a deceptive trade practice under .

124.    That California's Consumer Protection Act creates a private right to take legal action by any person who has been harmed from the Defendant's violation of Cal. Bus. Prof. Code 17200.

125.    That the Defendant's false representations within its contract and the concealment of false positives has deceived the Plaintiff and millions of other consumers who have been injured by the Defendant's deceptive practices. Furthermore, the Defendant is continuing to deceive millions of other consumers to induce them to enter into contract with it.

126.    That due to the Defendant's deceptive trade practices, the Plaintiff was severely harmed when he lost the benefits of a contract with his business associate valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00), which also caused him to lose a second and more valuable contract with Carmike Cinemas, Inc.

127.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

**TENTH CAUSE OF ACTION**
(Intentional Infliction of Emotional Distress)

128.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 127 with the same force and effect as if more fully set forth herein.

129.    That due to the Defendant's intentional acts against the Plaintiff, the Plaintiff has suffered extreme emotional distress.

130.    That Plaintiff began to suffer extreme emotional distress on or about July 25, 2007 when the Defendant wrongly withheld ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) of the Plaintiff's money that was meant as payment on two (2) third-party contracts.

131.    That Plaintiff continuous to suffer from extreme emotional distress due to Defendant's tortuous conduct in wrongly withholding Plaintiff's funds and causing him to lose the benefit of two (2) third-party contracts.

132.    That Defendant had actual knowledge or should have known that Plaintiff's emotional distress would be the likely result of its conduct.

133.    That Defendant's conduct in wrongly withholding Plaintiffs fund's was extreme and outrageous.

134.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

**Wherefore**, I demand a jury trial and pry for judgment against the Defendant as follows:

1)    Liability against the Defendant, and

2)    Rescind the defendant's contract, and

4)    Enjoin the defendant from further withholding Plaintiff's interest, and

5)    Enjoin the defendant from further concealing false positives and the dangers associated with them from all consumers, and

6)    Enjoin the defendant from using any damaging words  such as "suspicion of fraud", "suspicious activities" or "fraud" within any consumer email prior to an investigation being concluded, and

7)    Compensatory damages in the amount of TEN MILLIONS DOLLARS ($10,000,000.00), and

8)    Treble damages against the defendant, and

9)    Punitive damages against the Defendant in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00), and

10)    Costs and for such other and further relief as this Court deems just and proper.

Dated; New York, NY
    April 3, 2008

B. David Mehmet
Plaintiff
130 Church Street, Ste 251
New York, NY  10007
Tel: (212) 920-7602
Fax: (212) 387-9387
 Email: David@AppellateTerm.com

To: Paypal, Inc.
   2030 Main Street, Ste 1030
   Irvine, CA  92614

B. David Mehmet
130 Church Street
New York, NY  10007
Tele: (212) 920-7602
Fax:  (212) 387-9387
Email: David@AppellateTerm.com

Plaintiff Pro Se

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| B. David Mehmet, )<br><br>Plaintiff, )<br><br>vs. )<br><br><br>Paypal, Inc. )<br><br>Defendant. ) | Case No. C08-01961 (RMW)<br><br>**VERIFIED**<br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.    **Original Jurisdiction.**    This Court has original jurisdiction over this complaint pursuant to 28 U.S.C. §1332 as the amount in dispute exceeds $75,000.00 and the defendant holds residence in California while the Plaintiff holds residence in New York. In addition, this Court has original jurisdiction over the Complaint pursuant to 28 U.S.C. § 1331 as a cause of action pursuant to 18 U.S.C. 1962 (RICO) has been pleaded, and thus, jurisdiction within this Court is proper pursuant to 18 U.S.C. § 1964.

2.      **Venue**. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the defendant resides within the County of San Jose, California.

3.      **Intradistrict Assignment**. This lawsuit should be assigned to the San Jose Division of this Court because the parties agreed to this Division within a forum selection clause within their contract.

## FACTS

**Defendant Blocked Plaintiff's Account and Froze his Funds without GOOD CAUSE**

4.      That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 3 with the same force and effect as if more fully set forth herein.

5.      That the Defendant operates an Internet based website at www.Paypal.com that transfers money from one person to another person over the Internet (Hereinafter "money transfer service").

6.      That the Plaintiff used the Defendant's money transfer service to send $750.00 to Eric Anderson.

7.      That the Defendant obtained the $750.00 by electronically withdrawing the funds from the Plaintiff's bank account at Wachovia bank on or about July 25, 2007 by utilizing the Plaintiff's debit card, which had the following four last digits ...9024.

8.      That the Defendant blocked the Plaintiff's account after he paid Eric Anderson $750.00.

9.      That the Defendant blocked the account of Eric Anderson after the Plaintiff paid Eric Anderson $750.00.

10.    That the Defendant blocked the account of Eric Anderson after Eric Anderson transferred the $750.00 out of the Defendant's pooled bank account and into his bank account.

11.    That the Defendant deducted an additional $750.00 from Eric Anderson's account located at www.Paypal.com after Eric Anderson transferred the Plaintiff's $750.00 to his bank account.

12.    That the Defendant demanded that Eric Anderson repay the $750.00 he transferred into his bank account.

**Defendant Falsely Accused the Plaintiff of Fraud**

13.    That on August 6, 2007, the Defendant sent Eric Anderson an email that contained the subject: **"Re: Protections/Privacy/Security (Routing Code: C840-L001-Q414-T3335-S111): kd2 (KMM78622196LOKM)"**.

14.    That the Defendant's email sent to Eric Anderson, which had the above subject, contained the following statement quote: **"We received notification that the funds in question used for this transaction were possibly fraudulent. We did an investigation and it was determined that the funds, indeed, were fraudulent. As such, we had to return the funds to the party that had them taken from them without their authorization"** Unquote.

15.    That the Defendant's email dated August 6, 2007 to Eric Anderson noted in the paragraph above was referring to the $750.00 the Plaintiff paid to Eric Anderson through the Defendant's money transfer service.

16.    That the Defendant's email dated August 6, 2007 noted in the paragraph above was referring to the $750.00 the Defendant electronically withdrew from the Plaintiff's bank account at Wachovia bank.

17.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it conducted an "investigation", the Defendant did NOT conduct an investigation on the $750.00 payment to Eric Anderson prior to sending Eric Anderson that email.

18.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that the Plaintiff's $750.00 payment to Eric Anderson was "fraudulent", it was not.

19.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it had to return the $750.00 **"to the party that had them taken from them without their authorization"**, there was no other party that had $750.00 wrongly taken from them by the Plaintiff.

20.    That on or about July 25, 2007, the Defendant withheld a total of ONE $1,950.00 from the Plaintiff.

21.    That the $750.00 payment to Eric Anderson was part of the $1,950.00 being withheld by the Defendant on or about July 25, 2007.

22.    That on or about July 25, 2007, the Plaintiff demanded the Defendant return the $1,950.00 to him and the Defendant refused.

23.    That a copy of the contract between the Plaintiff and Eric Anderson was uploaded to the Defendant's website at www.Paypal.com in an effort to have the Defendant release the $750 to Eric Anderson.

24.    That when the Defendant return the $1,950.00 to the Plaintiff, it wrongly converted the Plaintiff's interest payments within its pooled bank account to its own use and it charged Eric Anderson a reversal fee when it had knowledge that the Plaintiff and Eric Anderson were victims of a false positive produced by the Defendant's anti-fraud detection software.

25.    That the Defendant did NOT pay the Plaintiff the interest payments earned on his $1,950.00, which was earned in the Defendant's pooled bank account.

26.     That in returning the Plaintiff's $1,950.00, the Defendant admitted that the $750.00 payment to Eric Anderson was a lawful transaction.

27.     That in returning the Plaintiff's $1,950.00, the Defendant admitted that it had no knowledge that there was another "party" that had $750.00 taken from them by the Plaintiff.

28.     That in returning the Plaintiff's $1,950.00, the Defendant admitted that the August 6, 2007 email sent to Eric Anderson contained false statements.

29.     That the Defendant defamed the Plaintiff in its August 6, 2007 email to Eric Anderson.

30.     That because of the Defendant's false statements to Eric Anderson that the Plaintiff committed fraud, Eric Anderson, who never did business with the Plaintiff before, became fearful of the Plaintiff.         .

31.     That due to the Defendant's false statements to Eric Anderson within its August 6, 2007 email, Eric Anderson terminated a contract with the Plaintiff and demanded that the Plaintiff pay him the total amount of $18,538.00 for his services, which was $17,038.00 above and beyond the contract terms, which the Plaintiff could not afford.

32.     That the Plaintiff was not able to pay Eric Anderson the extra funds requested above and beyond the contract amount.

33.     That the Plaintiff was unable to deliver the film treatment to his investor, which prevented the investor from investing in the Plaintiff's film.


**Defendant Caused Additional Damages to the Plaintiff**


34.     That due to Eric Anderson terminating his contract with the Plaintiff, the Plaintiff lost another contract with **Carmike Cinemas, Inc**. who were going to distribute and exhibit a film of

his in 600-1,000 movie screens across the United States, which film was to be produced by the Plaintiff. Thus, the Plaintiff has lost future revenue and profits from the inability to exhibit his property.

35.    That Darren man, who operates Mann Production Company in California, produced two TV commercials for the Plaintiff. Mr. Mann was to produce the movie "The Ultimate Hit" for the Plaintiff (hereinafter "Plaintiff's film"). Prior to August 6, 2007, Mr. Mann and the Plaintiff had estimated a low budget for the movie of $250,000.00 (www.TheUltimateHit.com).

36.    That the Plaintiff had a wealthy investor, Bahia M. Bin Chambi, who was going to invest the $250,000.00 needed to produce the Plaintiff's film, which investment was contingent on Eric Anderson delivering the film treatment to the Plaintiff. Without this investor, the Plaintiff would have not been able to finance his film on his own.

37.    That **Carmike Cinemas, Inc.** agreed to enter into contract with the Plaintiff to distribute the film within their movie theaters throughout the United States, and they guaranteed that the film would be distributed and exhibited on 600-1,000 of their movie screens. Such an agreement was agreed to by Carmike Cinemas, Inc. due to the fact the Plaintiff had an investor to finance his film.

38.    That Michael Burks agreed to help bring on board the famous actor James Purefoy to play a role in the Plaintiff's film. James Purefoy stared in the 2007 film "Frankenstein".

39.    That Michael Burks was involved in the successful production of the film George and the Dragon staring Patrick Swayze and James Purefoy.

40.    That the Plaintiff was also working with Michael Burks on another move called REDEEMED. Michael Burks had obtained a commitment letter from James Purefoy and director Tom Reeves for the film REDEEMED.

41.    That Michael Burks was introducing the Plaintiff to top people in the film industry and helping the Plaintiff secure these lucrative deals.

42.    That Michael Burks was doing all of the above for the Plaintiff because the Plaintiff had an investor willing to invest in the Plaintiff's film.

43.    That the Plaintiff suffered humiliation, embarrassment, outrage and extreme emotional distress due to the Defendant's false statements to Eric Anderson.

44.    That Michael Burks informed the Plaintiff that If the Plaintiff needed more funding, Michael Burks would assist the Plaintiff in obtaining the additional funding through the production company Centurion Entertainment. However, such additional funding was contingent on the Plaintiff obtaining the initial funding from his investor, Bahia M. Bin Chambi.

45.    That due to the Plaintiff's inability to obtain the film treatment, and his inability to obtain the financing to produce his film, the Plaintiff lost the distribution contract with **Carmike Cinemas, Inc.**

46.    That the Plaintiff was unable to employ the actor James Purefoy or any other actor.

47.    That after communicating with countless film production companies and investors the Plaintiff was unable to secure other financing to pay Eric Anderson for the film treatment.

48.    That the estimated damages to the Plaintiff from the Defendant's tortious conduct exceed $1,600.000.00.

49.    That at an average price of $8 a movie ticket, and with a low estimate of 200,000 paid admissions throughout the united states within Carmike Cinemas theaters, which breaks down to only 200 paid admissions per movie screen (1,000 screens), the gross income would have been a minimum of $1,600,000.00.

50.    That the 200,000 paid admissions estimate was generated from an average sale of the super low budget B movies produced between 2006-2007 that were financed for $200,000 to $700,000 and which grossed several million dollars.

51.    That the actors for the Plaintiff's film would have been paid $150,000 with an additional 10% of the gross profits going to the staring actor (total: $310,000).

52.    That Carmike Cinemas, Inc. would have taken 50% of the balance (Total: $645,000).

53.    That the Plaintiff would have been left with about $645,000.00.

54.    That $250,000 would have been paid back to the Plaintiff's investor, Bahia M. Bin Chambi, with 10% return on the investment from the Plaintiff's 50% share ($64,500.00),

55.    That the Plaintiff would have received about $330,500.00 in profits.

56.    That since B rated films have regularly given a return in the millions of dollars, especially one that stars a well-known actor, it is reasonable to conclude that a jury at trial will agree with the above formula in calculating damages against the Defendant.

57.    That it is reasonable to conclude that a jury at trial will agree that the damages identified above, resulted from the normal course of events caused by the Defendant's defamatory email sent to Eric Anderson.

### Defendant Intentionally Concealed a Vital Material Fact

58.    That the Plaintiff agreed to the Defendant's user agreement prior to July 25, 2007.

59.    That the Defendant did represent to the Plaintiff within its contract (hereinafter "User-Agreement") that it would not interfere with the Plaintiff's money transfers via its website located at www.PayPal.com without good cause.

60.    That the Defendant did represent to the Plaintiff within paragraph ten (10) of its User-Agreement that it would not interfere with the Plaintiff's money transfers via its website located at www.PayPal.com unless the Plaintiff violated paragraph nine (9) of the User-Agreement entitled "Restrictive Activities".

61.    That the Plaintiff was not in violation of the Defendant's User-Agreement when the Defendant blocked his account and froze his funds. Specifically, the Plaintiff did not commit fraud as the Defendant claimed in its August 6, 2007 email to Eric Anderson.

62.    That the Defendant did not place the Plaintiff on notice of any violation prior to blocking his account and freezing $1,950.00 of Plaintiff's money within its money transfer system.

63.    That the Defendant had knowingly and intentionally concealed vital material facts from the Plaintiff at the time the Plaintiff agreed to its User-Agreement that concerned false positives and the dangers associated with them, which false positives were and are produced by the Defendant's anti-fraud detection software.

64.    That Plaintiff's account was blocked and his $1,950.00 was frozen by the Defendant because its anti-fraud detection software produced a false positive.

65.    That the Defendant's anti-fraud detection software produced a false positive when Eric Anderson transferred the Plaintiff's $750.00 out of the Defendant's pooled bank account and into his own bank account.

66.    That the Defendant has inserted filters in its anti-fraud detection software that had automatically blocked the Plaintiff's and other consumers' accounts with the Defendant and froze

their funds when they attempted to transfer their funds out of the Defendant's pooled bank accounts and into their bank accounts.

67.    That the Defendant had devised a scheme to conceal false positives and the dangers associated with them from the Plaintiff and other consumers by fabricating good cause in electronic communications for the purpose of (1) inducing the Plaintiff and other consumers to enter into contract with it, (2) inducing the Plaintiff and other consumers to use its money transfer service without restraint, (3) to hold funds for 180 days to filter out and reduce its risk to fraudulent transactions to the detriment of innocent consumers, (4) to give a false impression that it was and is able to handle the millions of false positives produced by its anti-fraud detection software, (5) to wrongly convert consumers interest payments to its own use, (6) to increase its fees by charging a $10 chargeback and reversal fee when consumers turn against each other, and (7) to conceal causes of action against it when the Plaintiff and other consumers are damaged.

68.    That in justifying its actions in blocking the Plaintiff's and other consumers' accounts and freezing their funds, the Defendant utilized emails and telecommunications to fabricate good cause in blocking such accounts and freezing such funds. Which fabrication was also made to conceal that the Plaintiff and the other consumers were victims of a false positive.

69.    That many of the emails the Defendant sends to its consumers contain defamatory and inflammatory wording that causes consumers to turn against each other and motivates consumers to file complaints, requests for reversals and chargebacks. Which allows the Defendant to charge a $10 chargeback and reversal fee. And thus, enables the Defendant to increase its fees from 2.9% to 200% return on a $5.00 transaction, or about a 16% return on a $62.00 transaction.

70.    That in 2006, the Defendant reported that in its second quarter alone, it processed 143.3 million transactions. At a rate of 1% for false positives created by the Defendant's anti-fraud

detection software, the Defendant was hit with a minimum of 1.4 million false positives in the second quarter of 2006.

71.    That in the first quarter of 2007, the Defendant reported that it processed 177 Million transaction, which would have created over 1.7 million false positives at a rate of 1% for false positives.

72.    That the creation of millions of false positives is an accumulative amount that prevents the Defendant from effectively and timely investigating each one of them manually to determine whether they are false positives or not.

73.    That the Defendant devised a scheme to manage the millions of false positives while benefiting from the Plaintiff and other consumers' detriment. For example, the Defendant fabricates good cause to consumers by utilizing electronic communications to hold consumers' funds for 180 days, which it uses to filter out the fraudulent transactions so it does not have to manually investigate each an every one of them. The Defendant then wrongly converts the innocent consumers' interest payments to its own use and charges the innocent consumers chargeback and reversal fees after the innocent consumers' clients start requesting chargebacks and reversals.

74.    That in the first quarter of 2007, the Defendant reported that its total money transfers were $11 Billion, which consisted of 177 million transaction, which means the average transaction was about $62. Thus, with a 1% false positive rate on 177 million transactions (1.7 million false positives), and upon information and belief, the Defendant had in and around $105,400,000.00 affected by false positives in the first quarter of 2007. At a rate of 5% interest from the Defendant's bank, the Defendant wrongly converted in and around $439,000.00 per month of interest payments belonging to honest consumers. This calculation doesn't include all the funds being held by the Defendant from other quarters for 180 days, which will bring the monthly

conversion rate higher. It is estimated that the Defendant has been wrongly converting millions of dollars in interest payments each month from honest consumers who have been victimized by the Defendant's anti-fraud detection software that continues to produce millions of false positives. This is in addition to the chargeback and reversal fees wrongly charged to consumers victimized by false positives.

75.    That in the worst case, the Defendant's fabrication of good cause, by sending out defamatory and inflammatory emails to consumers, motivated a number of consumers to turn against each other, which caused two people, Sarah Holland and Matt Miller, to be falsely arrested and charged with Felony Internet Fraud.

76.    That in 2004, Matt Miller, who works for homeland security, was falsely arrested and charged with felony Internet fraud when one of his clients filed a criminal complaint against him after receiving Defendant's defamatory and inflammatory email that accused him of fraud.

77.    That in 2007, Sara Holland, a single mother of three and a volunteer firefighter, was falsely arrested due the Defendant's email that was sent to her client accusing her of fraud, Which caused her client to file a criminal complaint against her. She lost her job and had to pay $5,000.00 in bail to get out of jail.

78.    That in 2007, the Defendant also sent a defamatory and inflammatory email to the Plaintiff's business associate, Eric Anderson, that accused the Plaintiff of fraud and caused the Plaintiff to suffer serious damages.

79.    That on July 31, 2007, after the Plaintiff's account with the Defendant was blocked and his funds withheld; but before the Plaintiff filed a lawsuit against the Defendant in New York, the Plaintiff called the Defendant's customer service department and spoke to an employee of the Defendant named "Rene".

80.    That the Defendant's customer service representative informed the Plaintiff that his account was blocked by their anti-fraud detection software and that there was a limited amount of employees who review blocked accounts to identify false positives, which would result in the release of the Plaintiff's account.

81.    That the Defendant's customer service representative informed the Plaintiff that his account was blocked due to an old account, which had a debit of $695.00. This explanation was not only devoid of any proof of such debt; but contradicted the Defendant's statements to Eric Anderson in its email dated August 6, 2007 that stated the Plaintiff had defrauded someone.

82.    That a customer service representative of the Defendant requested that the Plaintiff mail the $695.00 via the U.S. Postal service since the old account was blocked.

83.    That after the Plaintiff was informed about this alleged outstanding balance, he investigated the matter further and uncovered that due to the Defendant's intentional and fraudulent attempts to avoid bank charges, the Defendant intentionally went into the Plaintiff's bank account to collect the $695.00 instead of using his debit card as the Plaintiff instructed the Defendant to do.

84.    That the multiple attempts by the Defendant to collect the $695.00 from his bank account instead of his debit card that was attached to another account, which includes one other similar incident uncovered so far, caused the Plaintiff's bank account to be charged over $1,000.00 in overdraft fees.

85.    That because the Plaintiff's bank charged him one single lump sum with the Defendant's name noted on it, Paypal, the Plaintiff believed that the Defendant had already collected its funds and he did not carefully scrutinize the charge to identify it was, in fact, an overcharge fee that was originating from his other account.

86.     In 2005, 28 U.S. Attorney Generals throughout the United States sued the Defendant and alleged that the Defendant was going into consumers' bank accounts instead of using their credit or debit cards as instructed. Even after agreeing not to commit this wrongful act against consumers in a 2006 settlement with the Attorney Generals, the Defendant violated that agreement when it attempted to collect funds from the Plaintiff's bank account instead of his debit card as instructed.

87.     That the Defendant is liable to the Plaintiff for over $1,000.00 in overdraft fees caused by its wrongful conduct and the Plaintiff owes no money to the Defendant.

88.     That, upon information and belief, the Defendant had sold the rights to the $695.00 debt to a collection agency prior to it sending the August 6, 2007 defamatory email to the Plaintiff's business associate, Eric Anderson.

89.     That prior to agreeing to the Defendant's User-Agreement, the Plaintiff had no knowledge of false positives and the dangers associated with them.

90.     That it was not until the Plaintiff uncovered a book by the Defendant's ex-employee, Eric M. Jackson, which identified false positives and some of the dangers associated with them that the Plaintiff started to understand how false positives affected the Defendant's money transfer service.

91.     That the ex-interim vice President of marketing, Mr. Eric M. Jackson, who was employed by the Defendant admitted in his book published in 2004 and entitled "The Paypal Wars, Battles with eBay , the Media, the Mafia and the Rest of Planet Earth" that quote: **"Paypal's success in fighting back fraud also produced false positives that inconvenienced honest users."** And that **"as bad as the false positives experience for innocent users and resulting negative publicity for the company might have been, it was an acceptable cost"** unquote.

92.    That the Defendant has been using the excuse of fighting fraud to commit fraud against the Plaintiff and other consumers, and at the same time, reaping a financial benefit to the detriment of the Plaintiff and other consumers.

93.    That if the Defendant disclosed the fact about false positives to the Plaintiff, the Plaintiff would have never used the Defendant's money transfer service to pay Eric Anderson. Nor would the Plaintiff have allowed the Defendant to withdraw $1,950.00 from his Wachovia bank account.

94.    That there are millions of consumers that have no knowledge of the Defendant's false positives and the dangers associated with them. Nor are these consumers aware that they may, at any time, be victimized by a false positive that could cause them to suffer great harm.

95.    That in its concealment of false positives from the Plaintiff and other consumers, the Defendant sent emails that requested verification prior to releasing their funds. When such verification was provided to the Defendant, the Defendant requested additional verification and when the additional verification was provided to the Defendant, the Defendant then issued a final refusal informing the Plaintiff and other consumers that their funds would be held for 180 days.

**PAYPAL BOILER PLATE EMAIL:**

"As part of our security measures, we regularly screen activity in the PayPal system. During a recent screening, we noticed an issue regarding your account. We are very sorry, but in accordance with the PayPal User Agreement, we are no longer able to have you as a customer. We have had to close your account for the following reason: Recent account activity has made it necessary for us to collect additional verification information. We apologize for any inconvenience this account closure may cause. You may still log in to PayPal to view your transactions history and personal information for a limited time. To review your account and some or all of the information that PayPal used to make its decision to limit your account access, please visit the Resolution Center. If, after reviewing your account information, you seek further clarification regarding your account access, please contact PayPal by visiting the Help Center and clicking "Contact Us". The funds in your account will be held for 180 days, due to the risk of outstanding chargebacks and complaints. After 180 days, any remaining funds will be available to you for withdrawal. We thank you for your prompt attention to this matter. Sincerely, PayPal Account Review Department PayPal"

96.    That although the Defendant states in its email that "**To review your account and some or all of the information that PayPal used to make its decision to limit your account access, please visit the Resolution Center**", the Defendant did not and does not provide any information that discloses the reason why an account has been blocked and the funds frozen. The Defendant only provides an ability to upload the requested verification.

97.    That Sherri Frost built a successful eBay business over four years with a near perfect feedback rating. She became a victim of the Defendant's false positives and scheme. Her frozen funds prevented her from paying her drop shippers. Her buyers filed complaints, requested chargebacks and reversals. In addition, they posted negative feedback on eBay accusing her of fraud, which destroyed her business.

98.    That on average, thousands of consumers have suffered damage to their reputation, loss of their business, loss of their products, loss of their principal funds, loss of their interest payments and loss of their causes of action against the Defendant due to the false positives and the Defendant's fraudulent scheme to conceal them while reaping benefits.

99.    That the following consumers are some of the thousands of consumers who were victims of the Defendant's false positives and scheme: Payment from Andrew Karas Jul. 8, 2005, $250.00 USD; Payment to Mike Phelps Jul. 7, 2005, $500.00; Payment to Billy's Bass Place Jul. 6, 2005 $39.95; Payment to Tracey Cruz Jul. 6, 2005 $1,450.00 USD; Payment from Carlos Rojas Jul. 6, 2005 $2,288.00 USD. The Defendant sent each of these consumers an email that fabricated good cause for freezing their funds.

100.    That the Defendant has even victimized numerous elderly consumers. For example, after Barbara Hopper, who is 65 years old, became a victim of a false positive produced by the Defendant's anti-fraud detection software in and around July 2007, Ms. Hopper became so desperate for help that she turned to the Internet forum boards where she posted a desperate

plea for help by posting a message to the public that stated quote: "i'm 65 yrs. old and i withdrew $500.00 of my own money. they say im laundering money. no one has made any complaints against me or my acct. they treat me hoorible when i try to striaghting this out. a class action law suit is in order. please help me."

101.    That the problem of false positives being produced by the Defendant's anti-fraud detection software is so serious that a supporter of the presidential candidate Ron Paul was affected by the Defendant's false positives in 2008.

102.    That the supporter of presidential candidate Ron Paul called the 'Granny Warriors' (hereinafter "supporter") was collecting donations via the Defendant's money transfer service to pay for a recount of the New Hampshire votes.

103.    That when the supporter attempted to transfer the donated monies out of the Defendant's pooled bank account and into its own bank account to pay the New Hampshire Secretary of State, the Defendant's anti-fraud detection software created a false positive and froze $55,600.00 on or before January 15, 2008, which caused the supporter to borrow money to meet the deadline for the recount.

104.    That when the Plaintiff spoke to a principal of the "Granny Warriors", she informed the Plaintiff that she did not know why the funds were frozen and that she had no knowledge of false positives and how they affect her account with the Defendant.

105.    That the Defendant has joined teams with its controlling company, eBay, and together they have made it mandatory to use the Defendant's money transfer service on eBay. In addition, many other Internet websites only use the Defendant's money transfer services with no alternative method of paying, which forces a consumer to use the Defendant's money transfer service.

106.   That with the knowledge of false positives, a consumer has the ability to protect themselves from great financial loss by not risking large amounts of money with the Defendant.

## Defendant's Continued Misconduct against Consumers

107.   That the Defendant has a history of bad conduct in harming consumers and having a disregard for the law to further its own profit agenda over the well-being of California consumers and all consumers Worldwide.

108.   That the Defendant was sued in 2002 under caption ***Comb, et al vs. Paypal, Inc***. **docket 02-1227** within The United States District Court for the Northern District of California. The complaint alleged that because the Defendant "**exceeded its operational capacity**" it was "**unable to maintain and manage accounts in a manner required by applicable state and federal legislation**." And the Defendant refused "**to provide details or explanations with respect to its investigations**" of frozen accounts. In addition, the Complaint alleged that when consumers where able to contact the Defendant's "**representatives, the representatives are combative and rude, refuse to answer specific questions, hang up in the middle of phone calls, provide "canned" responses to individualized problems, require customers to fax information while providing inoperative fax numbers, and refuse to allow customers to speak to managers.**" Judge Fogel, who presided over this lawsuit, issued a ruling that stated "**the Court concludes that the User Agreement and arbitration clause are substantively unconscionable**"

109.   That again, in 2004, the Defendant was sued this time by New York State's Attorney General, Eliot Spitzer, who alleged that the Defendant's User Agreement "**misrepresented certain terms and conditions to its members, which included statements that it provided its**

members "the rights and privileges expected of a credit card transaction. In fact, members were often denied these rights by the Defendant."

110.    That yet again, in 2005, the Defendant was sued in a class action lawsuit by 28 Attorney generals from Alabama, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Vermont, Washington and West Virginia. The 28 Attorney Generals accused the Defendant of "hidden fees, misrepresentations, as well as problems with account settings dealing with source of funding that resulted in monies being withdrawn from Defendant Paypal's members' bank account although other payment sources were preferred."

111.    That yet again, the Defendant was sued in a class action lawsuit in 2005 within the United States District Court Eastern District of New York under caption *Mike Steele, et al vs. Paypal and Essex Technology Group, Inc.* docket 05-01720 based on allegations of "deceptive trade practices, fraudulent inducement, misrepresentation and breach of contract."

112.    That although the Defendant has been sued multiple times in addition to the above lawsuits, the Defendant continues to engage in bad conduct against its consumers in an effort to increase its flow of profits. The Defendant has taken the stance that these lawsuits against it are just a **part of doing business**, and the Defendant resolved each of the lawsuits out of court to then only continue its bad conduct.

## FIRST CAUSE OF ACTION
### (Fraudulent Misrepresentation)

113.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 112 with the same force and effect as if more fully set forth herein.

114.    That the Defendant made representations to the Plaintiff within its User-Agreement that if the Plaintiff utilized its services to make payments to third-parties, the Defendant would forward the funds to such third-parties and would not wrongly interfere with such payments without good cause.

115.    That the Defendant intended the Plaintiff to have reliance on its representation within its User-Agreement when the Plaintiff agreed to its terms.

116.    That in reliance of Defendant's representations, the Plaintiff utilized the Defendant's service to send funds to third-parties.

117.    That contrary to Defendant's assurance that it would not wrongly interfere with Plaintiff's fund transfers, the Defendant on or about July 25, 2007 did wrongly withhold Plaintiff's funds and had wrongly refused to release the funds to the Plaintiff after the Plaintiff requested that the Defendant release his funds.

118.    That the Plaintiff did not violate the Defendant's User-Agreement nor did the Plaintiff commit fraud.

119.    That the Defendant had no intentions of honoring its representations within its User-Agreement to the Plaintiff.

120.    That the Defendant represented to the Plaintiff that if he provided additional verification of his identify, the Defendant would release his funds.

121.    That the Plaintiff, having reliance on the Defendant's statements, provided the additional verification requested by the Defendant.

122.    That the Defendant had no intentions of honoring its representations to the Plaintiff that it would release his funds if he provided the requested verification.

123. That after the Plaintiff provided the Defendant with the requested verification; the Defendant did fail to release the Plaintiff's funds and had continued to refuse to release such funds to the Plaintiff.

124. That once the Plaintiff filed a lawsuit in New York State against the Defendant, the Defendant deposited the Plaintiff's funds back into his bank account at Wachovia Bank via the Plaintiff's debit card ending in …9024.

125. That the Defendant had wrongly converted the interest earned from the Plaintiffs money within the Defendant's pooled bank account to its own use.

126. That at the time the Defendant had entered into contract with the Plaintiff, it had knowledge that its anti-fraud detection software could create a false positive against the Plaintiff and interfere with Plaintiff's fund transfers; but the Defendant intentionally and maliciously failed to disclose this fact to the Plaintiff to induce him to enter into contract with it and to use its money transfer service without restraint.

127. That the Defendant's anti-fraud detection software did create a false positive and did wrongly interfere with the Plaintiff's funds by blocking the Plaintiff's account and freezing his funds.

128. That the Defendant did refuse to release the Plaintiff's funds to his business associate, Eric Anderson.

129. That due to the Defendant's fraudulent misrepresentation, the Plaintiff has suffered general and special damages.

130. By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SECOND CAUSE OF ACTION
(Fraudulent Concealment)

131.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 130 with the same force and effect as if more fully set forth herein.

132.    That the Defendant did represent to the Plaintiff within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

133.    That the Defendant had knowledge of the falsity of its representations within its User-Agreement that it would not interfere with the Plaintiff's money transfers without good cause.

134    That the Defendant did intentionally and maliciously conceal material facts concerning false positives and the dangers associated with them from the Plaintiff, which could have and did interfere with the Plaintiff's money transfers without good cause.

135.    That the Defendant intentionally and maliciously concealed false positives and the dangers associated with them from the Plaintiff to gain the Plaintiff's reliance on its representations within its User-Agreement that it would not interfere with the Plaintiff's money transfers without good cause.

136.    That the Plaintiff had reliance on the Defendant's representations within its User-Agreement due to its well-known and dominant position within the market.

137.    That in furtherance of its concealment of false positives, the Defendant fabricated good cause for blocking the Plaintiff's account and freezing his funds by defaming the Plaintiff to his business associate, Eric Anderson.

138.    That due to the Defendant's fraudulent concealment, the Plaintiff suffered general and special damages.

139.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

### THIRD CAUSE OF ACTION
(Fraudulent Inducement)

140.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 139 with the same force and effect as if more fully set forth herein.

141.   That the Defendant did represent to the Plaintiff within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

142.   That the Defendant had knowledge of the falsity of its representations within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

143.   That the Defendant did intentionally and maliciously conceal material facts concerning false positives from the Plaintiff for the purpose of inducing the Plaintiff to enter into contract with it and to use its money transfer service without restraint.

144.   That the Plaintiff had reliance on the Defendant's representations due to its well-known and dominant position within the market.

145.   That due to the Defendant's fraudulent inducement, the Plaintiff has suffered general and special damages.

146.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

### FOURTH CAUSE OF ACTION
(Negligent Misrepresentation)

147.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 with the same force and effect as if more fully set forth herein.

148.   That the Defendant had a superior knowledge of false positives and the dangers associated with them, and thus, had a duty to disclose this fact to the Plaintiff prior to him agreeing to its User-Agreement.

149.   That the Defendant made a false representation within its User-Agreement that the Defendant would not interfere with the Plaintiff's money transfers without good cause that it should have known was incorrect because the possibility that the Plaintiff could have been victimized by a false positive and his funds automatically frozen by its anti-fraud detection software was foreseeable.

150.   That the Defendant had knowledge that the representations made within its User-Agreement would be relied on by the Plaintiff in deciding whether to agree to such User-Agreement.

151.   That the Plaintiff did have reliance on the representations made in the Defendant's User-Agreement, which caused the Plaintiff to agree to the Defendant's User-Agreement.

152.   That due to the Plaintiff's reliance on the Defendant's false representation within its User-Agreement, the Plaintiff was prevented from taking steps to protect himself and was eventually harmed.

153.   That due to the Defendant's negligent misrepresentation, the Plaintiff has suffered general and special damages.

154.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## FIFTH CAUSE OF ACTION
### (Defamation)

155.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 154 with the same force and effect as if more fully set forth herein.

156.   That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone.

157.    That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone for the purpose of fabricating good cause for blocking Plaintiff's account and freezing his funds.

158.    That the Defendant knew at the time it made such statements to Eric Anderson that those statements were false.

159.    That the Defendant did, with intent and malice, make false statements to Eric Anderson with full knowledge that the Plaintiff would be defamed and his reputation would be damaged.

160.    That the Defendant did make false statements to Eric Anderson with reckless disregard as to the truth of the statements and whether the statements defamed the Plaintiff.

161.    That Eric Anderson did have reliance on the Defendant's statements due to its well-known and dominant position within the market.

162.    That due to the Defendant's defamatory statements to Eric Anderson, the Plaintiff suffered general and special damages.

163.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SIXTH CAUSE OF ACTION
### (Defamation Per Se)

164.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 163 with the same force and effect as if more fully set forth herein.

165.    That the Defendant made intentional, malicious and defamatory statements against the Plaintiff to Eric Anderson that the Plaintiff defrauded someone.

166.    That the Defendant made intentional, malicious and defamatory statements against the Plaintiff to Eric Anderson that constitutes a violation of California's Penal Code § 484.

167. That the Defendant knew, at the time it made the statements to Eric Anderson, they were false.

168. That the Defendant did, with intent and malice, make such false statements to Eric Anderson in its attempt to create good cause for blocking Plaintiff's account and freezing his funds.

169. That the Defendant did act negligently in failing to learn whether the statements made to Eric Anderson were false and defamed the Plaintiff prior to making such statements.

170. That the Plaintiff suffered embarrassment, humiliation, outrage and extreme distress due to the Defendant's defamatory statements against him to Eric Anderson.

171. That due to the Defendant's defamatory statements to Eric Anderson accusing the Plaintiff of committing a crime, the Plaintiff has suffered general and special damages.

172. By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SEVENTH CAUSE OF ACTION
### (Conversion)

173. That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 172 with the same force and effect as if more fully set forth herein.

174. That the Defendant did wrongly gain possession of the Plaintiff's funds.

175. That the Defendant did wrongly refuse to forward Plaintiff's funds to Plaintiff's business associate, Eric Anderson.

176. That the Defendant did wrongly refuse to return Plaintiff's funds after Plaintiff requested such funds from the Defendant.

177.    That the Defendant did wrongly convert Plaintiff's interest payments to its own use, and has refused to release such interest to the Plaintiff after the Plaintiff requested its release.

178.    That due to the Defendant's wrongful conversion of the Plaintiff's interest payments to its own use, the Plaintiff has suffered general damages.

179.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## EIGHT CAUSE OF ACTION
(Tortious Interference with Business Relationship)

180.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 179 with the same force and effect as if more fully set forth herein.

181.    That the Plaintiff did have an economic relationship with his business associate, Eric Anderson, which gave the Plaintiff a benefit valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00).

182.    That the Defendant did have knowledge of the economic relationship between the Plaintiff and his business associate due to the fact the Defendant was in possession of a copy of the contract between the Plaintiff and Eric Anderson while the Defendant was in possession of the Plaintiff's funds.

183.    That the Defendant did with intent and malice interfere with Plaintiff's business relationship with his business associate by failing to forward the Plaintiff's funds to Eric Anderson and false accusing the Plaintiff of fraud.

184.    That the Defendant did with reckless disregard interfere with Plaintiff's business relationship with his business associate by failing to forward the Plaintiff's funds to Eric Anderson and falsely accusing the Plaintiff of fraud.

185.    That due to the Defendant's interference, the Plaintiff's contract and business relationship with his business associate, Eric Anderson, was terminated, and the Plaintiff lost the contract benefit of SEVENTEEN THOUSAND AND THIRTY EITGHT DOLLARS ($17,038.00).

186.    That due to the Defendant's tortious interference with the Plaintiff's business associate Eric Anderson, the Plaintiff has suffered general and special damages.

187.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## NINTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress)

188.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 187 with the same force and effect as if more fully set forth herein.

189.    That due to the Defendant's intentional acts against the Plaintiff, the Plaintiff has suffered extreme emotional distress.

190.    That the Plaintiff began to suffer emotional distress on or about July 25, 2007 when the Defendant wrongly withheld ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) of the Plaintiff's money that was meant as payment on two (2) third-party contracts.

191.    That the Plaintiff began to suffer extreme emotional distress on or about August 6, 2007 when the Defendant falsely accused the Plaintiff of committing a crime to his business associate, Eric Anderson.

192.    That the Defendant had actual knowledge or should have known that Plaintiff's emotional distress would be the likely result of its conduct.

193.    That the Defendant's conduct in wrongly withholding Plaintiffs fund's and then falsely accusing him of committing a crime to his business associate, Eric Anderson, was extreme and outrageous.

194.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## TENTH CAUSE OF ACTION
(Violation of Cal. Civil Code §§ 17200
unlawful, Unfair and Fraudulent Business Practices)

195.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 194 with the same force and effect as if more fully set forth herein

196.   That the Defendant's false representations within its contract pertaining to its interference of Plaintiff's fund transfers and its concealment of a material fact concerning false positives, which were meant to induce the Plaintiff to enter into contract with it and to utilize its money transfer service without restraint constitutes a deceptive trade practice under  Cal. Civil Code §§17200.

197.   That California's Consumer Remedies Act creates a private right to take legal action by any person who has been harmed from the Defendant's violation of Cal. Civil Code  §§ 17200.

198.   That the Defendant's false representations within its contract and the concealment of false positives has deceived the Plaintiff and millions of other consumers who have been injured by the Defendant's deceptive practices. Furthermore, the Defendant is continuing to deceive millions of other consumers to induce them to enter into contract with it and to use its money transfer service without restraint.

199.   That the Defendant intentionally devised a scheme to manage the millions of false positives produced by its anti-fraud detection software, and in doing so, the Defendant has been reaping a financial benefit to the detriment of consumers.

200.   That due to the Defendant's deceptive trade practices, the Plaintiff and other consumers have suffered general and special damages.

201.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## ELEVENTH CAUSE OF ACTION
(Violation of the Rico Act, 18 U.S.C. §§ 1961)

202.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 201 with the same force and effect as if more fully set forth herein.

203.   That the defendant violated the RICO Act by engaging in two or more criminal acts as described under 18 U.S.C. §1962 (Prohibited activities) against the Plaintiff and other consumers throughout the United States.

204.   That the Defendant devised a scheme to manage millions of false positives by concealing the false positives from the Plaintiff and other consumers while reaping financial benefits to the Plaintiff's and consumers' detriment.

205.   That the defendant committed a pattern of criminal acts as part of its scheme to conceal false positives and the dangers associated with them from the Plaintiff and millions of consumers.

206.   That in furtherance of its scheme, the Defendant fabricated good cause in blocking the Plaintiff's and other consumers' accounts and freezing their funds.

207.   That in furtherance of its scheme, the Defendant wrongly converted to its own use the interest payments earned from the Plaintiff's funds and from the funds of other consumers that were held in the Defendant's pooled bank accounts when it had knowledge that they were victims of a false positive.

208.   That in furtherance of its scheme, the Defendant wrongly charged Eric Anderson and other consumers' chargeback and reversal fees when it had knowledge that they were victims of a false positive.

209.   That the Defendant is continuing its fraudulent scheme with other consumers and it is wrongly continuing to convert consumers' interest payments to its own use and it is continuing

to charge fees for chargebacks and reversals when it has knowledge that such consumers were victims of a false positive.

210.   That the Defendant repeatedly engaged in this fraudulent scheme against the Plaintiff and other consumers and continues to engage in this fraudulent scheme by utilizing electronic communications (email and telecommunications), which constitutes wire fraud pursuant to 18 U.S.C. § 1343.

211.   That in furtherance of its fraudulent scheme, the Defendant utilized electronic communications by posting a User Agreement on its website at www.PayPal.com to the Plaintiff and millions of other consumers that was and still is devoid of any mention of false positives and the dangers associated with them.

212.   That on July 31, 2007, and in furtherance of its scheme, the Defendant did have its customer service employee, Rene, utilize telecommunications in California to falsely inform the Plaintiff in New York that his account was blocked and his funds frozen due to a past due balance of $695.00 when, in fact, the Plaintiff's account was blocked and his funds frozen due to a false positive created when Eric Anderson transferred the Plaintiff's funds out of the Defendant's pooled bank account, and upon information and belief, the right to the $695.00 debt had previously been sold by the Defendant to a collection agency.

213.   That on August 6, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California in the form of an email sent to Eric Anderson in Illinois that falsely informed Eric Anderson that the Plaintiff's funds were fraudulent, that the Defendant conducted an investigation, which concluded the Plaintiff's funds were "indeed" fraudulent and that the Defendant had to give the funds back to the person the Plaintiff stole them from.

214.   That on or about July 25, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California to New York in the form of an email and falsely informed Web Scribble Solutions, Inc. why the Plaintiff's funds were frozen.

215.    That on or about July 25, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California in the form of an email sent to the Plaintiff in New York, which falsely informed the Plaintiff that if he submitted additional verification of his identity, the Defendant would release his funds.

216.    That in furtherance of its scheme, the Defendant has and continues to utilize electronic communications to falsely inform other consumers throughout multiple States within the United States that if they submit additional verification of their identity, their funds would be released.

217.    That in furtherance of its scheme, the Defendant concealed false positives and the dangers associated with them from the Plaintiff and millions of other consumers to induce them to enter into contract with it and to use its money transfer service without restraint.

218.    That the Defendant has utilized the ill-gotten financial gains from its fraudulent scheme to invest in other companies. Specifically, the Defendant used the ill-gotten financial gains to acquire Fraud Sciences, a private overseas company.

219.    That as a corporation, which repeatedly engaged in a pattern of fraud over multiple years against the Plaintiff and other consumers and continues to engage in a pattern of fraud against other consumers as described above, the Defendant is considered to be an enterprise pursuant to 18 U.S.C. §1961(4) that has violated the RICO Act and is continuing to violate the RICO Act as defined by federal law pursuant to 18 U.S.C. § 1961(1).

220.    That due to the Defendant's fraudulent scheme, the Plaintiff has suffered both general and special damages.

221.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

**Wherefore**, Plaintiff demands a jury trial and prays for judgment against the Defendant as follows:

1) Liability against the Defendant, and

2) Rescind the defendant's contract, and

3) Enjoin the defendant from further withholding Plaintiff's interest payments, and

4) Enjoin the defendant from further concealing false positives and the dangers associated with them from all consumers, and

5) Enjoin the defendant from using any damaging words such as "suspicion of fraud", "suspicious activities" or "fraud" within any consumer communications prior to a valid investigation being concluded, and

6) Compensatory damages, consisting of general and special damages, in the amount of TEN MILLIONS DOLLARS ($10,000,000.00), and

7) Treble damages against the defendant, and

8) Punitive damages against the Defendant in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00), and

9) Costs and for such other and further relief as this Court deems just and proper.

Dated: New York, NY
     May 19, 2008

B. David Mehmet
Plaintiff

To: Mr. Oleg Cross
   Cooley Godward Kronish, LLP.
   4401 Eastgate Mall
   San Diego, CA  92121
   (858) 550-6000
   (858) 550-6420

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

B. David Mehmet,

      Plaintiff,

      -against-

Paypal, Inc.

      Defendant.

Civil Case No. 5:08-01961 ~~(RS)~~ (RMW)

**VERIFICATION OF COMPLAINT**

I, Badisse David Mehmet, declare:

1. I am the Plaintiff in the above captioned matter. *Amended* ßM

2. I verify that the foregoing Verified Complaint was duly prepared by me and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3. I declare under the penalty of perjury that the foregoing is true and correct.

Executed in New York, N.Y. on May 19th, 2008.

**ON THIS DAY OF ~~[illegible]~~ May 19th IN THE YEAR OF 2008, THE ABOVE SIGNED PERSON BADISSE DAVID MEMET PERSONALLY KNOWN, WHO, BEING DULY SWORN, DID EXECUTE THE FOREGOING VERIFICATION AND DID SO AS HIS FREE ACT AND DEED. IN WITNESS WHEREOF, I HEREUNTO SET MY HAND AND OFFICIAL SEAL**

—————————————————
        **NOTARY**

Respectfully submitted,

B. David Mehmet
Plaintiff
130 Church Street, Ste 251
New York, NY  10007
Telephone: (212) 920-7602
Facsimile:  (212) 387-9387
Email: David@AppellateTerm.com

JEAN-PAUL GRECZI
Notary Public, State of New York
No. 01GR6119330
Qualified in Queens County
Commission Expires November 29, 2008

**B**



**YAHOO!** MAIL
Classic                                                      Print - Close Window

**Date:**      Thu, 14 Jun 2007 14:36:33 -0400

**To:**        "Badisse Mehmet" <FleaMarket@MyStockroom.com>

**Subject:**   Re: BankAccounts (Routing Code: C840-L001-Q220-T2505-S111) QID1998 (KMM57882196V45970L0KM) :kd1

**From:**      webform@paypal.com

Dear Badisse Mehmet,

Hello my name is Lynda, I will be happy to assist you with your question
regarding your recent transaction.  I am sorry for your inconvenience.

If you have registered a credit card and a confirmed bank account, Instant
Transfer from your bank account is the default method of payment when the
PayPal account balance is insufficient to complete the payment.

The default method of payment cannot be changed; however, if you would like
to fund your payment with a credit card, please follow these steps:

    1.  On the final payment page, click the "More Funding Options" link and
choose the credit card you would like to use to fund the payment.

    2.  Click "Continue."

    3.  Click "Yes" to confirm the use of your credit card.

    4.  Review the details of your payment.

    5.  Click "Pay" or "Send Money" to complete the payment or click
"Change" if any changes are needed. NOTE: If you change your payment
details, the payment method will return to the default method of
payment.

If you have applied for and been approved for a PayPal Plus Credit Card or
a PayPal Buyer Credit account, you can switch your payment method to one of
these options.

I appreciate the opportunity to assist you. We are committed to making your
experiences at PayPal pleasant and rewarding.

Sincerely,
Lynda
PayPal Community Support
PayPal, an eBay Company


Original Message Follows:
------------------------
Form Message
customer subject: I closed my bank account - stop trying to transfer
customer message: Additional Information: 'Paypal was suppose to use my

debit card to pull the money as the first option. There was plenty of money
there. But Paypal used my savings account as the first option when there
was no money in the account. Paypal has been hitting me with electronic

EX. B

attempts to transfer money from my savings account and my bank has been

rejecting the attempts and charging me $## for each attempt by Paypal. Last
week, my bank charged me $###.## in total overdraft fees due to these
Paypal attempts. I had my bank give me credit for these attempts and void
the $###.##. The bank told me that they are unable to stop the Paypal
attempts so I had to close the account. But before I closed the account,
Paypal hit me again with two more charges and this time my bank took $## in
over draft fees.

I do not want my bank account to be associated with my Paypal account and
would like it to be removed. Also, please use the first funding source to
pay any outstanding charges. Thank You.  Badisse.'

C

 ebafilms    7346 Lake Street 1W | River Forest, Illinois 60305 | 708.366.0674 | www.ebafilms.com

May 2, 2008

B. David Mehmet
130 Church Street
New York, NY 10007

Re: The Ultimate Hit Script

I am making the following statement under the penalty of perjury for the purpose of clarifying my actions in canceling the contract dated July 17, 2007 between myself and Mr. Mehmet. I was completely justified in terminating the contract with Mr. Mehmet. Prior to entering into contract with Mr. Mehmet, I had no business relationship with Mr. Mehmet, nor did I have any history with him. My reason for terminating the contract with Mr. Mehmet was for the purpose of protecting myself. After Paypal froze my account and demanded the return of Mr. Mehmet's $750 initial payment to me, I wrote an email to Paypal asking them what was going on. Paypal sent me an email on August 6, 2007 that contained the following statement:

**Subject: Re: Protections/Privacy/Security (Routing Code: C840-L001-Q414-T3335-S111): kd2 (KMM78622196LOKM)**

**Dear Eric Anderson,**

**Thank you for contacting Paypal. We regret the delay in responding to your service request. We regret that you have had this experience. We received notification that the funds in question used for this transaction were possibly fraudulent. We did an investigation and it was determined that the funds, indeed, were fraudulent. As such, we had to return the funds to the party that had them taken from them without their authorization. You are not protected from this reversal of funds under our Seller Protection Policy, as this transaction was not listed as eligible. I do regret any frustration that this may cause. Thanks again for writing, and thank you for being part of the Paypal community. Sincerely, Paypal Account Review Department**

Paypal's email justified my termination of the contract with Mr. Mehmet. Paypal has never informed me that the statements in their email were false. I had no reason not to believe Paypal, as I had been doing business with them for some time and had never encountered this problem. Paypal's email caused me to doubt Mr. Mehmet's legitimacy, forcing me to terminate our contract. I still have some doubt regarding Mr. Mehmet due to Paypal's email, because they specifically stated they conducted an investigation that concluded the funds Mr. Mehmet sent me were fraudulent. At this time, I do not feel comfortable placing myself at risk with Mr. Mehmet as I did in the July 17, 2007 contract, when I offered to do the work with only a small deposit in advance. Since my account with Paypal remains frozen due to this transacation, the only way I am comfortable working with Mr. Mehmet going forward is in offering him the opportunity to pay me for my services in full prior to completing and delivering his film treatment to him. Otherwise, I am not interested.

Sworn to before me on 05/02/2008

_____
NOTARY

_____
Eric Anderson

OFFICIAL SEAL
DOUGLAS COLBER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/30/12

# YAHOO! MAIL

Print - Close Window

**Date:**    Mon, 6 Aug 2007 06:26:42 -0700 (PDT)

**From:**    "Eric Anderson" <eanderso@yahoo.com>

**Subject:**    Fwd: Re: Protections/Privacy/Security (Routing Code:C840-L001-Q414-T3335-S111) :kd2 (KMM78622I96L0KM)

**To:**    "Badisse Productions" <badisse@badisse.com>

I would say we need to clear this up, wouldn't you?  It's not a happy Monday morning for me...

**"pending-reversal@paypal.com" <pending-reversal@paypal.com>** wrote:

> Date: Mon, 6 Aug 2007 05:51:03 -0500 (CDT)
> From: "pending-reversal@paypal.com" <pending-reversal@paypal.com>
> To: Eric Anderson <eanderso@yahoo.com>
> Subject: Re: Protections/Privacy/Security (Routing Code:C840-L001-Q414-T3335-S111) :kd2
> (KMM78622I96L0KM)
>
> Dear Eric Anderson,
>
> Thank you for contacting PayPal. We regret the delay in responding to
> your service request.
>
> We regret that you have had this experience. We received notification
> that the funds in question used for this transaction were possibly
> fraudulent. We did an investigation and it was determined that the
> funds, indeed, were fraudulent. As such, we had to return the funds to
> the party that had them taken from them without their authorization.
> You are not protected from this reversal of funds under our Seller
> Protection Policy, as this transaction was not listed as eligible. I do
> regret any frustration that this may cause.
>
> Thanks again for writing, and thank you for being part of the PayPal
> community.
>
> Sincerely,
> PayPal Account Review Department
> PayPal, an eBay Company
>
>
> Original Message Follows:
> ------------------------
> Form Message
> customer subject: I'm trying to figure out why a claim has been filed.
> customer message: Additional Information: I'm trying to determine if
> this
> is simply a part of PayPal's security process, or if the client reversed
>
> the charges.
>
> Eric Anderson'

*Exhibit "C"*

9/24/2007 5:53 PM


**YAHOO!** MAIL
Classic

Print - Close Window

**Date:**    Fri, 9 May 2008 09:00:04 -0700 (PDT)

**From:**    "Eric Anderson" <eanderso@yahoo.com>

**Subject:**  Re: LEGAL NOTICE: Federal Subpoena

**To:**      badisse@badisse.com

What in God's name are you talking about? I've sent you numerous emails about this, and I told you that you're going to receive the damn letter this afternoon. I also sent you an email telling you to mail me the $30 I paid to overnight it to you, but this is the response I get? Can you see why I might have trust issues with you? So far, I'm out nearly $750 over this mess, between the original chargeback and the FedEx I sent last night.

*Badisse Productions <badisse@badisse.com> wrote:*

> Mr. Anderson,
>
> I have repeatedly requested that you provide me with a notarized letter, which you agreed to do explaining your reasons for terminating our contract. You agreed to overnight the letter to me as it was vital to an upcoming motion. However, after about two weeks, I have not received your letter.
>
> I understand your position and I do not blame you. I think if I received the email you received from Paypal, I may also react as you have.
>
> Nevertheless, I am giving you a heads up so you don't get caught without notice. I have requested that the federal Court in San Jose issue federal subpoenas to obtain the information I need for this motion due to my failure from obtaining it from you. My process server will be serving the subpoenas today. You will not be served with one; but companies that have the information I am looking for will be.
>
> If you have any questions, you are free to contact me.
>
> Thank You,
>
> B. David Mehmet

EBA Creative Agency
www.ebacreative.com

EBAFilms
www.ebafilms.com

"Red, White & Blue: A Tale of Two Americas" Documentary
filmriot.com/projects/30-rwbdocumentary

*Alena & the Favorite Thing*
Written by Eric B. Anderson, Illustrated by Jakub Kuzma
www.alenabooks.com

**D**

**YAHOO! MAIL**
Classic

Print - Close Window

| | |
|---|---|
| **Date:** | Wed, 25 Jul 2007 07:23:01 -0700 (PDT) |
| **From:** | "Badisse Productions" <badisse@badisse.com> |
| **Subject:** | Re: Investors |
| **To:** | mfbravenhouse@aol.com |

I have a mixture of institutional investors who have invested in film before through a movie hedge fund and private individual investors who want to get their feet wet. The private investors are igniting the interest of the institutional investors since they don't have to hold the entire risk. One of the private investors is a family friend.

| | |
|---|---|
| United States District Court Northern District of California San Jose Division<br>-----------------------------------------------------------X<br>B. David Mehmet<br> Plaintiff, <br><br>-against-<br><br>Paypal, Inc.,<br> Defendant. <br>-----------------------------------------------------------X | Index No.: 5:08-01961 (RS)<br><br><br>**AFFIDAVIT** |

**BAHIA M. BIN CHAMBI**, states the following to be true under the penalty of perjury:

1.      I do have personal knowledge of the information stated here.

2.      I am a business woman of over 30 years experience within real estate. Over the years I have been very successful. At this time, my estimated net worth is valued at over $16 Million, and I do invest in worthwhile projects as the one David Mehmet presented me with that involved producing a movie called 'the ultimate hit'. The movie idea is a good concept, there were top people involved and it looked like it had great potential.

3.      Prior to July 25, 2007, I did agree with David Mehmet that I would invest $250,000 with him to produce his movie. However, this agreement was on the condition that he deliver a movie treatment to me. The return on my investment was going to be the principal investment plus 10% of the profits David Mehmet received. To date, David Mehmet has not delivered any movie treatment to me so I have not invested any money with him.

4.      I was also aware that David Mehmet was working with some very high people in the movie industry, which caught my interest. He did provide me with proof that he was getting a distribution agreement with Carmika Cinema Inc to exhibit his film on a number of their movie

screens across America. Also, I was aware that he had been introduced to the actor James Purefoy who expressed an interest in the movie.

5.    David Mehmet has approached me for pre-treatment financing and has asked me for a considerable amount of money to finish the movie treatment. However, without having the movie treatment in my hands, I refused to give him the funds.  The reason behind my refusal was that without the movie treatment, my funds are more at risk. The movie treatment would have given me a tangible product that had some worth.

6.    Unfortunately, and as I understand it, due to David Mehmet's problems with Paypal he is unable to deliver the movie treatment. My understanding is that Paypal defamed David Mehmet with Mr. Eric Anderson who has refused to deliver the movie treatment unless David Mehmet pays him a large sum of money, which I have been told he does not have. I am also aware that Mr. Micheal Burks, who was helping David Mehmet break into the movie industry by introducing him to top executives in the movie industry and by negotiating contracts for him has backed away from him due to my refusal to finance this project.

May 5/19/ , 2008

Bahia M. Bin Chambi

Sworn to before me    05 / 19 / 2008

_____
Notary Public
POLIN LO
Notary Public, State of New York
No. 01LO6111756
Qualified in Kings County
Commission Expires June 28, 2008

E

# YAHOO! MAIL
### Classic

Print - Close Window

**To:** badisse@badisse.com

**Subject:** Carmike

**Date:** Tue, 17 Jul 2007 14:08:21 -0400

**From:** mfbravenhouse@aol.com

David,
   Did you receive my email in regards to the Carmike meeting this morning?

Mike

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

 **MAIL** Classic

Print - Close Window

| | |
|---|---|
| **To:** | badisse@badisse.com |
| **Subject:** | Release |
| **Date:** | Tue, 17 Jul 2007 11:30:00 -0400 |
| **From:** | mfbravenhouse@aol.com |

David,
  Had a good meeting this morning.  Your letter for exhibition of your film should go out in a couple of days.

Mike

---

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

# YAHOO!® MAIL
### Classic

Print - Close Window

**From:**    Mfbravenhouse@aol.com

**Date:**    Mon, 23 Jul 2007 19:22:45 EDT

**Subject:**  Re: Letter

**To:**      badisse@badisse.com

I just checked on the status of your letter.  The head buyer is waiting on their in-house attorney to sign off on it. Hopefully it will go out in a day or two. Sorry for the delay, but they have their procedures.

Mike

Get a sneak peek of the all-new AOL.com.

# YAHOO!® MAIL
Classic

Print - Close Window

| | |
|---|---|
| **To:** | badisse@badisse.com |
| **Subject:** | Ultimate Hit |
| **Date:** | Mon, 16 Jul 2007 15:12:21 -0400 |
| **From:** | mfbravenhouse@aol.com |

David,

   Just now got the treatment for Disney off to my manager, and can relax a spell.  Don't know if you received my last email of about 3 hours ago.  At any rate, if you go with Brian, I have other stuff to work on, so just let me know what you'd like to do.

Mike

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

F


**YAHOO! MAIL** Classic

Print - Close Window

**To:** badisse@badisse.com

**Subject:** Intent ltrs

**Date:** Tue, 31 Jul 2007 09:35:30 -0400

**From:** mfbravenhouse@aol.com

David,
  Attached is an email I received from James Purefoy, who would like to play Pontius. And, an early email from the director, Tom Reeve.  Note that Tom is absolutely on board. He and I, (and our wives) have been personal friends for 23 years.
  I'll get the EU financing letter off to you later today.

Mike

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

**Plain Text Attachment**

```
TO WHOM IT MAY CONCERN:

I, James Purefoy, let it be known that it is my intention to take
part in Michael F Burks's film 'Redeemed', providing that the final
shooting script meets with my approval.

Yours sincerely,

James Purefoy
```

**Plain Text Attachment**

```
Dear Mike,
This email confirms that I am interested in directing the Motion
 Picture currently entitled REDEEMED subject, of course, to my availability
 and my approval of budget, schedule, cast, script and key crew.
We will also need to be able to agree upon the principal deal terms of
 my engagement.
Best wishes, Tom

Tom Reeve
TRS Enterprises
Luxembourg
```

G

646-536-2771

## Writer for Hire Short Form Agreement

### RE: "The Ultimate Hit"

The following are the terms of the agreement stipulated on July 17, 2007 between B. David Mehmet d/b/a Badisse Productions ("Producer" and "Company") and located at 130 Church Street, Ste 251, New York, NY 10007 for the production and distribution of the "The Ultimate Hit" feature motion picture and Eric Anderson, ("Writer") located at 7346 Lake Street #1W, River Forest, Illinois, 60305 for his writing services in connection with a treatment for a feature screenplay entitled "THE ULTIMATE HIT", collectively herein called "TREATMENT".

**COMPENSATION:**

Producer agrees to pay Writer and Writer agrees to accept, as full and complete compensation for Writer's services hereunder:

1) An advance of $1500 is payable to Writer by Producer upon commencement of this contract.

2) A guaranteed compensation of $18,538 USD, which is the standard rate identified by the Writers Guild of America for a treatment, minus any monies advanced to Writer by Badisse Productions, receipt of which will be presented by Writer when full compensation is due. This guaranteed compensation is payable to Writer by Producer or Financing Entity or Studio at the time Producer has secured full financing of this motion picture project "The Ultimate Hit", ("The Movie") and in any case no later than 4 weeks prior to commencement of principal photography of "The Ultimate Hit" movie.

**OWNERSHIP:**

The Writer acknowledges that the original Story, Characters and Screenplay are the original creation and/or sole property and/or copyright of the Producer and as such any and all additional Revenues from any sale and/or option of the Screenplay "The Ultimate Hit" --or any subsequent additions and/or revisions are also the sole copyright of the Producer-- and that minus the writer's guaranteed compensation, will be paid solely to Producer or its assigns.

**POLISH AND CHANGES:**

If there are minor changes (no more than three passes) to be made to the Treatment, following instructions of Producer, the Writer will do so at no charge to Producer.

**CREDIT:**

On condition that Writer fully and completely keeps and performs all of Writer's obligations and agreements hereunder and as approved by Producer, Producer agrees to Writer on a minimum "Story By" screen credit and in all paid visual and written advertisements of the

Page 1 of 5

Exhibit "C"

motion picture. Subject to the foregoing provisions, Producer shall solely determine in his discretion the manner of presenting such credits.

No casual or inadvertent failure or failure of any other person, firm or corporation to comply with the provisions of this Paragraph shall constitute breach by Producer of his obligations under this Paragraph.

In the event Writer is accorded separation of the rights pursuant to applicable provisions of the Writers Guild of America Basic Agreement, Producer shall be deemed to have acquired such rights by separate negotiations and all parties acknowledge that the WGA Agreement does not apply to this Agreement.

## PREMIERES:

If writer receives writing credit, Company or its assigns shall provide Writer and one (1) guest with an invitation to the initial celebrity premiere, if held, or if unable to guarantee the above, to the first cast and crew screening.

## VIDEOCASSETTE:

Writer will receive a copy of the Movie on DVD, prior to its Release for Distribution as provided by Company or its assignees.

## TRANSPORTATION AND EXPENSES:

If Company requires Producer to cause Writer to perform additional writing services hereunder at a location more than 100 miles from Writer's principal place of residence, which is Chicago, Illinois, Writer shall be given business class (if available) transportation to and from such location, first class accommodations and a Per Diem as determined by the Production Budget and approved by Company or its assignees.

## NOTICES:

All notices shall be sent as follows:

To Writer:

Eric Anderson
7346 Lake Street #1W
River Forest, Illinois 60305
el: 708.366.0674
Fax: none
Mobile: 708.359.2783
Email: eanderso@yahoo.com
Web: www.ehafilms.com
        www.ebacreative.com

To Producer /. Company:

B. David Mehmet
Badisse Productions
130 Church Street, Ste 251
New York, NY 10007
Tel: 212-920-7602
Fax: 646-536-2771
Mobile: 917-309-2510
Email: Badisse@Badisse.com

Page 2 of 5

**RESULTS AND PROCEEDS:**

Work-Made-For-Hire: Writer acknowledges that all results, product and proceeds of Writer's services (including all original ideas in connection therewith) are being specially ordered by Producer for use as part of a Motion Picture and shall be considered a "work made for hire" for Producer as specially commissioned for use as a part of a motion picture and any and all other uses and exploitations in accordance with Sections 101 and 201 of Title 17 of the U.S. Copyright Act. Therefore, Producer shall be the sole author and copyright owner thereof for all purposes throughout the universe without limitation of any kind or nature. In consideration of the monies paid to Writer hereunder, Producer shall solely and exclusively own throughout the universe in perpetuity all rights of every kind and nature whether now or hereafter known or created in and in connection with such results, product and proceeds, in whatever stage of completion as may exist from time to time, including: (i) the copyright and all rights of copyright; (ii) all neighboring rights, trademarks and any and all other ownership and exploitation rights now or hereafter recognized in any Territory, including all rental, lending, fixation, reproduction, broadcasting (including satellite transmission), distribution and all other rights of communication by any and all means, media, devices, processes and technology; (iii) the rights to adapt, rearrange, and make changes in, deletions from and additions to such results, product and proceeds, and to use all or any part thereof in new versions, adaptations, and other Motion Pictures including Remakes and Sequels; (iv) the right to use the title of the Work in connection therewith or otherwise and to change such title; and (v) all rights generally known as the "moral rights of authors."

**WARRANTY AND INDEMNIFICATION:**

1. Writer is free to enter into this Agreement and no rights of any third parties are or will be violated by Writer entering into or performing this Agreement. Writer will not subject to any conflicting obligation or any disability, and Writer has not made and shall not hereafter make any agreement with any third party, which could interfere with the rights granted to Company hereunder or the full performance of Writer's obligation and services hereunder.

2. All of the Work (and the Property, if any) shall be wholly original with Writer and none of the same has been or shall be copied from or based upon any other work unless assigned in this contract. The reproduction, exhibition, or any use thereof or any of the rights herein granted shall not defame any person or entity nor violate any copyright or right of privacy or publicity, or any other right of any person or entity. The warranty in this subparagraph shall not apply to any material as furnished to Writer by Company (unless such furnished material was written or created by Writer or originally furnished to Company by Writer) or material inserted in the Work by Company, but shall apply to all material which Writer may add thereto.

3. Writer shall indemnify and hold harmless Company (and its affiliated companies, successors, assigns, and the directors, officers, employees, agents, and representatives of the foregoing) from any damage, loss, liability, cost, penalty, guild fee or award, or expense of any kind (including attorney's fees (hereinafter "Liability") arising out of, resulting from, based upon or incurred because of a breach by Writer of any agreement, representation, or warranty made by Writer hereunder. The party receiving notice of such claim, demand or action shall promptly notify the other party thereof. The pendency of

Page 3 of 5

such claim, demand, or action shall not release Company of its obligation to pay Writer sums due hereunder.

4. Company agrees to indemnify Writer and hold Writer harmless from and against any and all damages and expenses (other than with respect to any settlement entered into without Company's written consent) arising out of any third party claim against Writer resulting from Company's development, production, distribution and/or exploitation of the Project.

## AGREEMENT OF THE PARTIES:

This document [including Attachments as Addendums, if any] shall constitute the agreement between the parties until modified or amended by a subsequent writing by mutual consent.

## ACCEPTED AND AGREED:

By _____

B. David Mehmet – Producer
Badisse Productions – Company

By _____

Eric B. Anderson – Writer

H

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| B. David Mehmet,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Paypal, Inc.<br>　　　　　　　　　Defendant. | Case No. 5:08-cv-01961 (RMW)<br><br>**[PROPOSED] ORDER<br>DENYING MOTION TO DISMISS<br>AND GRANTING CROSS-MOTION** |

That having heard the Defendant's motion to dismiss the Complaint and Plaintiff's Cross-Motion for Partial Summary Judgment and to Amend the Complaint on June 27, 2008, Plaintiff appearing Pro Se and Defendant appearing by counsel, and after having considered the papers upon submission of both parties filed in support and in opposition to the Motion and Cross-Motion, and other pleadings and documents filed herein, the Court finds that it does have jurisdiction over this matter as the Defendant has failed to prove with a legal certainty that the amount in controversy is less then $75,000.00, and the Court further finds that the Defendant has failed to establish a material issue of fact pursuant to Rule 56(e)(1) of the Federal Rules Civil Procedure.

**[Proposed] Order Denying Motion to<br>Dismiss and Granting Cross-Motion**

Accordingly, good cause appearing, **IT IS HEREBY ORDERED THAT**:

    (a) Defendant's motion to dismiss the Complaint is denied; and

    (b) Plaintiff's Cross-Motion for partial summary judgment on liability for defamation is

        granted; and

    (c) Determination of damages is to be held in abeyance until trial.

## IT IS SO ORDERED.

Dated_____

                                        _____
                                        Hon. Ronald M. Whyte
                                        United States District Judge