B. David Mehmet
130 Church Street
New York, NY 10007
Tele: (212) 920-7602
Fax: (212) 387-9387
Email: David@AppellateTerm.com

Plaintiff Pro Se

**FILED**

2008 MAY 27 P 2: 57

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| B. David Mehmet, ) | Case No. C08-01961 (RMW) |
| Plaintiff, ) | |
| vs. ) | **VERIFIED** |
| ) | **AMENDED COMPLAINT** |
| Paypal, Inc. ) | **DEMAND FOR JURY TRIAL** |
| Defendant. ) | |

1.     **Original Jurisdiction.**  This Court has original jurisdiction over this complaint pursuant to 28 U.S.C. §1332 as the amount in dispute exceeds $75,000.00 and the defendant holds residence in California while the Plaintiff holds residence in New York. In addition, this Court has original jurisdiction over the Complaint pursuant to 28 U.S.C. § 1331 as a cause of action pursuant to 18 U.S.C. 1962 (RICO) has been pleaded, and thus, jurisdiction within this Court is proper pursuant to 18 U.S.C. § 1964.

2.    **Venue**. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the defendant resides within the County of San Jose, California.

3.    **Intradistrict Assignment.** This lawsuit should be assigned to the San Jose Division of this Court because the parties agreed to this Division within a forum selection clause within their contract.

## FACTS

### Defendant Blocked Plaintiff's Account and Froze his Funds without GOOD CAUSE

4.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 3 with the same force and effect as if more fully set forth herein.

5.    That the Defendant operates an Internet based website at www.Paypal.com that transfers money from one person to another person over the Internet (Hereinafter "money transfer service").

6.    That the Plaintiff used the Defendant's money transfer service to send $750.00 to Eric Anderson.

7.    That the Defendant obtained the $750.00 by electronically withdrawing the funds from the Plaintiff's bank account at Wachovia bank on or about July 25, 2007 by utilizing the Plaintiff's debit card, which had the following four last digits ...9024.

8.    That the Defendant blocked the Plaintiff's account after he paid Eric Anderson $750.00.

9.    That the Defendant blocked the account of Eric Anderson after the Plaintiff paid Eric Anderson $750.00.

10.    That the Defendant blocked the account of Eric Anderson after Eric Anderson transferred the $750.00 out of the Defendant's pooled bank account and into his bank account.

11.    That the Defendant deducted an additional $750.00 from Eric Anderson's account located at www.Paypal.com after Eric Anderson transferred the Plaintiff's $750.00 to his bank account.

12.    That the Defendant demanded that Eric Anderson repay the $750.00 he transferred into his bank account.

### Defendant Falsely Accused the Plaintiff of Fraud

13.    That on August 6, 2007, the Defendant sent Eric Anderson an email that contained the subject: **"Re: Protections/Privacy/Security (Routing Code: C840-L001-Q414-T3335-S111): kd2 (KMM78622196LOKM)"**.

14.    That the Defendant's email sent to Eric Anderson, which had the above subject, contained the following statement quote: **"We received notification that the funds in question used for this transaction were possibly fraudulent. We did an investigation and it was determined that the funds, indeed, were fraudulent. As such, we had to return the funds to the party that had them taken from them without their authorization"** Unquote.

15.    That the Defendant's email dated August 6, 2007 to Eric Anderson noted in the paragraph above was referring to the $750.00 the Plaintiff paid to Eric Anderson through the Defendant's money transfer service.

16.    That the Defendant's email dated August 6, 2007 noted in the paragraph above was referring to the $750.00 the Defendant electronically withdrew from the Plaintiff's bank account at Wachovia bank.

17.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it conducted an "investigation", the Defendant did NOT conduct an investigation on the $750.00 payment to Eric Anderson prior to sending Eric Anderson that email.

18.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that the Plaintiff's $750.00 payment to Eric Anderson was "fraudulent", it was not.

19.    That contrary to the Defendant's statement in its August 6, 2007 email to Eric Anderson that it had to return the $750.00 **"to the party that had them taken from them without their authorization"**, there was no other party that had $750.00 wrongly taken from them by the Plaintiff.

20.    That on or about July 25, 2007, the Defendant withheld a total of ONE $1,950.00 from the Plaintiff.

21.    That the $750.00 payment to Eric Anderson was part of the $1,950.00 being withheld by the Defendant on or about July 25, 2007.

22.    That on or about July 25, 2007, the Plaintiff demanded the Defendant return the $1,950.00 to him and the Defendant refused.

23.    That a copy of the contract between the Plaintiff and Eric Anderson was uploaded to the Defendant's website at www.Paypal.com in an effort to have the Defendant release the $750 to Eric Anderson.

24.    That when the Defendant return the $1,950.00 to the Plaintiff, it wrongly converted the Plaintiff's interest payments within its pooled bank account to its own use and it charged Eric Anderson a reversal fee when it had knowledge that the Plaintiff and Eric Anderson were victims of a false positive produced by the Defendant's anti-fraud detection software.

25.    That the Defendant did NOT pay the Plaintiff the interest payments earned on his $1,950.00, which was earned in the Defendant's pooled bank account.

26.    That in returning the Plaintiff's $1,950.00, the Defendant admitted that the $750.00 payment to Eric Anderson was a lawful transaction.

27.    That in returning the Plaintiff's $1,950.00, the Defendant admitted that it had no knowledge that there was another "party" that had $750.00 taken from them by the Plaintiff.

28.    That in returning the Plaintiff's $1,950.00, the Defendant admitted that the August 6, 2007 email sent to Eric Anderson contained false statements.

29.    That the Defendant defamed the Plaintiff in its August 6, 2007 email to Eric Anderson.

30.    That because of the Defendant's false statements to Eric Anderson that the Plaintiff committed fraud, Eric Anderson, who never did business with the Plaintiff before, became fearful of the Plaintiff.    .

31.    That due to the Defendant's false statements to Eric Anderson within its August 6, 2007 email, Eric Anderson terminated a contract with the Plaintiff and demanded that the Plaintiff pay him the total amount of $18,538.00 for his services, which was $17,038.00 above and beyond the contract terms, which the Plaintiff could not afford.

32.    That the Plaintiff was not able to pay Eric Anderson the extra funds requested above and beyond the contract amount.

33.    That the Plaintiff was unable to deliver the film treatment to his investor, which prevented the investor from investing in the Plaintiff's film.

### Defendant Caused Additional Damages to the Plaintiff

34.    That due to Eric Anderson terminating his contract with the Plaintiff, the Plaintiff lost another contract with **Carmike Cinemas, Inc**. who were going to distribute and exhibit a film of

his in 600-1,000 movie screens across the United States, which film was to be produced by the Plaintiff. Thus, the Plaintiff has lost future revenue and profits from the inability to exhibit his property.

35.    That Darren man, who operates Mann Production Company in California, produced two TV commercials for the Plaintiff. Mr. Mann was to produce the movie "The Ultimate Hit" for the Plaintiff (hereinafter "Plaintiff's film"). Prior to August 6, 2007, Mr. Mann and the Plaintiff had estimated a low budget for the movie of $250,000.00 (www.TheUltimateHit.com).

36.    That the Plaintiff had a wealthy investor, Bahia M. Bin Chambi, who was going to invest the $250,000.00 needed to produce the Plaintiff's film, which investment was contingent on Eric Anderson delivering the film treatment to the Plaintiff. Without this investor, the Plaintiff would have not been able to finance his film on his own.

37.    That **Carmike Cinemas, Inc**. agreed to enter into contract with the Plaintiff to distribute the film within their movie theaters throughout the United States, and they guaranteed that the film would be distributed and exhibited on 600-1,000 of their movie screens. Such an agreement was agreed to by Carmike Cinemas, Inc. due to the fact the Plaintiff had an investor to finance his film.

38.    That Michael Burks agreed to help bring on board the famous actor James Purefoy to play a role in the Plaintiff's film. James Purefoy stared in the 2007 film "Frankenstein".

39.    That Michael Burks was involved in the successful production of the film George and the Dragon staring Patrick Swayze and James Purefoy.

40.    That the Plaintiff was also working with Michael Burks on another move called REDEEMED. Michael Burks had obtained a commitment letter from James Purefoy and director Tom Reeves for the film REDEEMED.

41.    That Michael Burks was introducing the Plaintiff to top people in the film industry and helping the Plaintiff secure these lucrative deals.

42.    That Michael Burks was doing all of the above for the Plaintiff because the Plaintiff had an investor willing to invest in the Plaintiff's film.

43.    That the Plaintiff suffered humiliation, embarrassment, outrage and extreme emotional distress  due to the Defendant's false statements to Eric Anderson.

44.    That Michael Burks informed the Plaintiff that If the Plaintiff needed more funding, Michael Burks would assist the Plaintiff in obtaining the additional funding through the production company Centurion Entertainment. However, such additional funding was contingent on the Plaintiff obtaining the initial funding from his investor, Bahia M. Bin Chambi.

45.    That due to the Plaintiff's inability to obtain the film treatment, and his inability to obtain the financing to produce his film, the Plaintiff lost the distribution contract with **Carmike Cinemas, Inc.**

46.    That the Plaintiff was unable to employ the actor James Purefoy or any other actor.

47.    That after communicating with countless film production companies and investors the Plaintiff was unable to secure other financing to pay Eric Anderson for the film treatment.

48.    That the estimated damages to the Plaintiff from the Defendant's tortious conduct exceed $1,600.000.00.

49.    That at an average price of $8 a movie ticket, and with a low estimate of 200,000 paid admissions throughout the united states within Carmike Cinemas theaters, which breaks down to only 200 paid admissions per movie screen (1,000 screens), the gross income would have been a minimum of $1,600,000.00.

50.    That the 200,000 paid admissions estimate was generated from an average sale of the super low budget B movies produced between 2006-2007 that were financed for $200,000 to $700,000 and which grossed several million dollars.

51.    That the actors for the Plaintiff's film would have been paid $150,000 with an additional 10% of the gross profits going to the staring actor (total: $310,000).

52.    That Carmike Cinemas, Inc. would have taken 50% of the balance (Total: $645,000).

53.    That the Plaintiff would have been left with about $645,000.00.

54.    That $250,000 would have been paid back to the Plaintiff's investor, Bahia M. Bin Chambi, with 10% return on the investment from the Plaintiff's 50% share ($64,500.00),

55.    That the Plaintiff would have received about $330,500.00 in profits.

56.    That since B rated films have regularly given a return in the millions of dollars, especially one that stars a well-known actor, it is reasonable to conclude that a jury at trial will agree with the above formula in calculating damages against the Defendant.

57.    That it is reasonable to conclude that a jury at trial will agree that the damages identified above, resulted from the normal course of events caused by the Defendant's defamatory email sent to Eric Anderson.


### Defendant Intentionally Concealed a Vital Material Fact


58.    That the Plaintiff agreed to the Defendant's user agreement prior to July 25, 2007.

59.    That the Defendant did represent to the Plaintiff within its contract (hereinafter "User-Agreement") that it would not interfere with the Plaintiff's money transfers via its website located at www.Paypal.com without good cause.

60.    That the Defendant did represent to the Plaintiff within paragraph ten (10) of its User-Agreement that it would not interfere with the Plaintiff's money transfers via its website located at www.Paypal.com unless the Plaintiff violated paragraph nine (9) of the User-Agreement entitled "Restrictive Activities".

61.    That the Plaintiff was not in violation of the Defendant's User-Agreement when the Defendant blocked his account and froze his funds. Specifically, the Plaintiff did not commit fraud as the Defendant claimed in its August 6, 2007 email to Eric Anderson.

62.    That the Defendant did not place the Plaintiff on notice of any violation prior to blocking his account and freezing $1,950.00 of Plaintiff's money within its money transfer system.

63.    That the Defendant had knowingly and intentionally concealed vital material facts from the Plaintiff at the time the Plaintiff agreed to its User-Agreement that concerned false positives and the dangers associated with them, which false positives were and are produced by the Defendant's anti-fraud detection software.

64.    That Plaintiff's account was blocked and his $1,950.00 was frozen by the Defendant because its anti-fraud detection software produced a false positive.

65.    That the Defendant's anti-fraud detection software produced a false positive when Eric Anderson transferred the Plaintiff's $750.00 out of the Defendant's pooled bank account and into his own bank account.

66.    That the Defendant has inserted filters in its anti-fraud detection software that had automatically blocked the Plaintiff's and other consumers' accounts with the Defendant and froze

their funds when they attempted to transfer their funds out of the Defendant's pooled bank accounts and into their bank accounts.

67.    That the Defendant had devised a scheme to conceal false positives and the dangers associated with them from the Plaintiff and other consumers by fabricating good cause in electronic communications for the purpose of (1) inducing the Plaintiff and other consumers to enter into contract with it, (2) inducing the Plaintiff and other consumers to use its money transfer service without restraint, (3) to hold funds for 180 days to filter out and reduce its risk to fraudulent transactions to the detriment of innocent consumers, (4) to give a false impression that it was and is able to handle the millions of false positives produced by its anti-fraud detection software, (5) to wrongly convert consumers interest payments to its own use, (6) to increase its fees by charging a $10 chargeback and reversal fee when consumers turn against each other, and (7) to conceal causes of action against it when the Plaintiff and other consumers are damaged.

68.    That in justifying its actions in blocking the Plaintiff's and other consumers' accounts and freezing their funds, the Defendant utilized emails and telecommunications to fabricate good cause in blocking such accounts and freezing such funds. Which fabrication was also made to conceal that the Plaintiff and the other consumers were victims of a false positive.

69.    That many of the emails the Defendant sends to its consumers contain defamatory and inflammatory wording that causes consumers to turn against each other and motivates consumers to file complaints, requests for reversals and chargebacks. Which allows the Defendant to charge a $10 chargeback and reversal fee. And thus, enables the Defendant to increase its fees from 2.9% to 200% return on a $5.00 transaction, or about a 16% return on a $62.00 transaction.

70.    That in 2006, the Defendant reported that in its second quarter alone, it processed 143.3 million transactions. At a rate of 1% for false positives created by the Defendant's anti-fraud

detection software, the Defendant was hit with a minimum of 1.4 million false positives in the second quarter of 2006.

71.    That in the first quarter of 2007, the Defendant reported that it processed 177 Million transaction, which would have created over 1.7 million false positives at a rate of 1% for false positives.

72.    That the creation of millions of false positives is an accumulative amount that prevents the Defendant from effectively and timely investigating each one of them manually to determine whether they are false positives or not.

73.    That the Defendant devised a scheme to manage the millions of false positives while benefiting from the Plaintiff and other consumers' detriment. For example, the Defendant fabricates good cause to consumers by utilizing electronic communications to hold consumers' funds for 180 days, which it uses to filter out the fraudulent transactions so it does not have to manually investigate each an every one of them. The Defendant then wrongly converts the innocent consumers' interest payments to its own use and charges the innocent consumers chargeback and reversal fees after the innocent consumers' clients start requesting chargebacks and reversals.

74.    That in the first quarter of 2007, the Defendant reported that its total money transfers were $11 Billion, which consisted of 177 million transaction, which means the average transaction was about $62. Thus, with a 1% false positive rate on 177 million transactions (1.7 million false positives), and upon information and belief, the Defendant had in and around $105,400,000.00 affected by false positives in the first quarter of 2007. At a rate of 5% interest from the Defendant's bank, the Defendant wrongly converted in and around $439,000.00 per month of interest payments belonging to honest consumers. This calculation doesn't include all the funds being held by the Defendant from other quarters for 180 days, which will bring the monthly

conversion rate higher. It is estimated that the Defendant has been wrongly converting millions of dollars in interest payments each month from honest consumers who have been victimized by the Defendant's anti-fraud detection software that continues to produce millions of false positives. This is in addition to the chargeback and reversal fees wrongly charged to consumers victimized by false positives.

75.    That in the worst case, the Defendant's fabrication of good cause, by sending out defamatory and inflammatory emails to consumers, motivated a number of consumers to turn against each other, which caused two people, Sarah Holland and Matt Miller, to be falsely arrested and charged with Felony Internet Fraud.

76.    That in 2004, Matt Miller, who works for homeland security, was falsely arrested and charged with felony Internet fraud when one of his clients filed a criminal complaint against him after receiving Defendant's defamatory and inflammatory email that accused him of fraud.

77.    That in 2007, Sara Holland, a single mother of three and a volunteer firefighter, was falsely arrested due the Defendant's email that was sent to her client accusing her of fraud, Which caused her client to file a criminal complaint against her. She lost her job and had to pay $5,000.00 in bail to get out of jail.

78.    That in 2007, the Defendant also sent a defamatory and inflammatory email to the Plaintiff's business associate, Eric Anderson, that accused the Plaintiff of fraud and caused the Plaintiff to suffer serious damages.

79.    That on July 31, 2007, after the Plaintiff's account with the Defendant was blocked and his funds withheld; but before the Plaintiff filed a lawsuit against the Defendant in New York, the Plaintiff called the Defendant's customer service department and spoke to an employee of the Defendant named "Rene".

80.    That the Defendant's customer service representative informed the Plaintiff that his account was blocked by their anti-fraud detection software and that there was a limited amount of employees who review blocked accounts to identify false positives, which would result in the release of the Plaintiff's account.

81.    That the Defendant's customer service representative informed the Plaintiff that his account was blocked due to an old account, which had a debit of $695.00. This explanation was not only devoid of any proof of such debt; but contradicted the Defendant's statements to Eric Anderson in its email dated August 6, 2007 that stated the Plaintiff had defrauded someone.

82.    That a customer service representative of the Defendant requested that the Plaintiff mail the $695.00 via the U.S. Postal service since the old account was blocked.

83.    That after the Plaintiff was informed about this alleged outstanding balance, he investigated the matter further and uncovered that due to the Defendant's intentional and fraudulent attempts to avoid bank charges, the Defendant intentionally went into the Plaintiff's bank account to collect the $695.00 instead of using his debit card as the Plaintiff instructed the Defendant to do.

84.    That the multiple attempts by the Defendant to collect the $695.00 from his bank account instead of his debit card that was attached to another account, which includes one other similar incident uncovered so far, caused the Plaintiff's bank account to be charged over $1,000.00 in overdraft fees.

85.    That because the Plaintiff's bank charged him one single lump sum with the Defendant's name noted on it, Paypal, the Plaintiff believed that the Defendant had already collected its funds and he did not carefully scrutinize the charge to identify it was, in fact, an overcharge fee that was originating from his other account.

86.    In 2005, 28 U.S. Attorney Generals throughout the United States sued the Defendant and alleged that the Defendant was going into consumers' bank accounts instead of using their credit or debit cards as instructed. Even after agreeing not to commit this wrongful act against consumers in a 2006 settlement with the Attorney Generals, the Defendant violated that agreement when it attempted to collect funds from the Plaintiff's bank account instead of his debit card as instructed.

87.    That the Defendant is liable to the Plaintiff for over $1,000.00 in overdraft fees caused by its wrongful conduct and the Plaintiff owes no money to the Defendant.

88.    That, upon information and belief, the Defendant had sold the rights to the $695.00 debt to a collection agency prior to it sending the August 6, 2007 defamatory email to the Plaintiff's business associate, Eric Anderson.

89.    That prior to agreeing to the Defendant's User-Agreement, the Plaintiff had no knowledge of false positives and the dangers associated with them.

90.    That it was not until the Plaintiff uncovered a book by the Defendant's ex-employee, Eric M. Jackson, which identified false positives and some of the dangers associated with them that the Plaintiff started to understand how false positives affected the Defendant's money transfer service.

91.    That the ex-interim vice President of marketing, Mr. Eric M. Jackson, who was employed by the Defendant admitted in his book published in 2004 and entitled "The Paypal Wars, Battles with eBay , the Media, the Mafia and the Rest of Planet Earth" that quote: ""**Paypal's success in fighting back fraud also produced false positives that inconvenienced honest users.**" And that "**as bad as the false positives experience for innocent users and resulting negative publicity for the company might have been, it was an acceptable cost**" unquote.

92.    That the Defendant has been using the excuse of fighting fraud to commit fraud against the Plaintiff and other consumers, and at the same time, reaping a financial benefit to the detriment of the Plaintiff and other consumers.

93.    That if the Defendant disclosed the fact about false positives to the Plaintiff, the Plaintiff would have never used the Defendant's money transfer service to pay Eric Anderson. Nor would the Plaintiff have allowed the Defendant to withdraw $1,950.00 from his Wachovia bank account.

94.    That there are millions of consumers that have no knowledge of the Defendant's false positives and the dangers associated with them. Nor are these consumers aware that they may, at any time, be victimized by a false positive that could cause them to suffer great harm.

95.    That in its concealment of false positives from the Plaintiff and other consumers, the Defendant sent emails that requested verification prior to releasing their funds. When such verification was provided to the Defendant, the Defendant requested additional verification and when the additional verification was provided to the Defendant, the Defendant then issued a final refusal informing the Plaintiff and other consumers that their funds would be held for 180 days.

**PAYPAL BOILER PLATE EMAIL:**

**"As part of our security measures, we regularly screen activity in the PayPal system. During a recent screening, we noticed an issue regarding your account. We are very sorry, but in accordance with the PayPal User Agreement, we are no longer able to have you as a customer. We have had to close your account for the following reason: Recent account activity has made it necessary for us to collect additional verification information. We apologize for any inconvenience this account closure may cause. You may still log in to PayPal to view your transactions history and personal information for a limited time. To review your account and some or all of the information that PayPal used to make its decision to limit your account access, please visit the Resolution Center. If, after reviewing your account information, you seek further clarification regarding your account access, please contact PayPal by visiting the Help Center and clicking "Contact Us". The funds in your account will be held for 180 days, due to the risk of outstanding chargebacks and complaints. After 180 days, any remaining funds will be available to you for withdrawal. We thank you for your prompt attention to this matter. Sincerely, PayPal Account Review Department PayPal"**

96.   That although the Defendant states in its email that "**To review your account and some or all of the information that PayPal used to make its decision to limit your account access, please visit the Resolution Center"**, the Defendant did not and does not provide any information that discloses the reason why an account has been blocked and the funds frozen. The Defendant only provides an ability to upload the requested verification.

97.   That Sherri Frost built a successful eBay business over four years with a near perfect feedback rating. She became a victim of the Defendant's false positives and scheme. Her frozen funds prevented her from paying her drop shippers. Her buyers filed complaints, requested chargebacks and reversals. In addition, they posted negative feedback on eBay accusing her of fraud, which destroyed her business.

98.   That on average, thousands of consumers have suffered damage to their reputation, loss of their business, loss of their products, loss of their principal funds, loss of their interest payments and loss of their causes of action against the Defendant due to the false positives and the Defendant's fraudulent scheme to conceal them while reaping benefits.

99.   That the following consumers are some of the thousands of consumers who were victims of the Defendant's false positives and scheme: Payment from Andrew Karas  Jul. 8, 2005, $250.00 USD; Payment to Mike Phelps Jul. 7, 2005, $500.00; Payment to Billy's Bass Place Jul. 6, 2005 $39.95; Payment to Tracey Cruz Jul. 6, 2005 $1,450.00 USD; Payment from Carlos Rojas Jul. 6, 2005 $2,288.00 USD. The Defendant sent each of these consumers an email that fabricated good cause for freezing their funds.

100.   That the Defendant has even victimized numerous elderly consumers. For example, after Barbara Hopper, who is 65 years old, became a victim of a false positive produced by the Defendant's anti-fraud detection software in and around July 2007, Ms. Hopper became so desperate for help that she turned to the Internet forum boards where she posted a desperate

plea for help by posting a message to the public that stated quote: "**i'm 65 yrs. old and i withdrew $500.00 of my own money. they say im laundering money. no one has made any complaints against me or my acct. they treat me hoorible when i try to striaghting this out. a class action law suit is in order. please help me.**"

101.   That the problem of false positives being produced by the Defendant's anti-fraud detection software is so serious that a supporter of the presidential candidate Ron Paul was affected by the Defendant's false positives in 2008.

102.   That the supporter of presidential candidate Ron Paul called the 'Granny Warriors' (hereinafter "supporter") was collecting donations via the Defendant's money transfer service to pay for a recount of the New Hampshire votes.

103.   That when the supporter attempted to transfer the donated monies out of the Defendant's pooled bank account and into its own bank account to pay the New Hampshire Secretary of State, the Defendant's anti-fraud detection software created a false positive and froze $55,600.00 on or before January 15, 2008, which caused the supporter to borrow money to meet the deadline for the recount.

104.   That when the Plaintiff spoke to a principal of the "Granny Warriors", she informed the Plaintiff that she did not know why the funds were frozen and that she had no knowledge of false positives and how they affect her account with the Defendant.

105.   That the Defendant has joined teams with its controlling company, eBay, and together they have made it mandatory to use the Defendant's money transfer service on eBay. In addition, many other Internet websites only use the Defendant's money transfer services with no alternative method of paying, which forces a consumer to use the Defendant's money transfer service.

106.   That with the knowledge of false positives, a consumer has the ability to protect themselves from great financial loss by not risking large amounts of money with the Defendant.

## Defendant's Continued Misconduct against Consumers

107.   That the Defendant has a history of bad conduct in harming consumers and having a disregard for the law to further its own profit agenda over the well-being of California consumers and all consumers Worldwide.

108.   That the Defendant was sued in 2002 under caption ***Comb, et al vs. Paypal, Inc***. **docket 02-1227** within The United States District Court for the Northern District of California. The complaint alleged that because the Defendant "<u>**exceeded its operational capacity**</u>" it was "<u>**unable to maintain and manage accounts in a manner required by applicable state and**</u> <u>**federal legislation**</u>." And the Defendant refused "<u>**to provide details or explanations with**</u> <u>**respect to its investigations**</u>" of frozen accounts. In addition, the Complaint alleged that when consumers where able to contact the Defendant's "<u>**representatives, the representatives are**</u> <u>**combative and rude, refuse to answer specific questions, hang up in the middle of phone**</u> <u>**calls, provide "canned" responses to individualized problems, require customers to fax**</u> <u>**information while providing inoperative fax numbers, and refuse to allow customers to**</u> <u>**speak to managers."**</u> Judge Fogel, who presided over this lawsuit, issued a ruling that stated "<u>**the**</u> <u>**Court concludes that the User Agreement and arbitration clause are substantively**</u> <u>**unconscionable**</u>"

109.   That again, in 2004, the Defendant was sued this time by New York State's Attorney General, Eliot Spitzer, who alleged that the Defendant's User Agreement "<u>**misrepresented**</u> <u>**certain terms and conditions to its members, which included statements that it provided its**</u>

members "**the rights and privileges expected of a credit card transaction. In fact, members were often denied these rights by the Defendant**."

110.   That yet again, in 2005, the Defendant was sued in a class action lawsuit by 28 Attorney generals from Alabama, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Vermont, Washington and West Virginia. The 28 Attorney Generals accused the Defendant of "**hidden fees, misrepresentations, as well as problems with account settings dealing with source of funding that resulted in monies being withdrawn from Defendant Paypal's members' bank account although other payment sources were preferred.**"

111.   That yet again, the Defendant was sued in a class action lawsuit in 2005 within the United States District Court Eastern District of New York under caption *Mike Steele, et al vs. Paypal and Essex Technology Group, Inc.* **docket 05-01720** based on allegations of "**deceptive trade practices, fraudulent inducement, misrepresentation and breach of contract.**"

112.   That although the Defendant has been sued multiple times in addition to the above lawsuits, the Defendant continues to engage in bad conduct against its consumers in an effort to increase its flow of profits. The Defendant has taken the stance that these lawsuits against it are just a **part of doing business**, and the Defendant resolved each of the lawsuits out of court to then only continue its bad conduct.

### FIRST CAUSE OF ACTION
(Fraudulent Misrepresentation)

113.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 112 with the same force and effect as if more fully set forth herein.

114.   That the Defendant made representations to the Plaintiff within its User-Agreement that if the Plaintiff utilized its services to make payments to third-parties, the Defendant would forward the funds to such third-parties and would not wrongly interfere with such payments without good cause.

115.   That the Defendant intended the Plaintiff to have reliance on its representation within its User-Agreement when the Plaintiff agreed to its terms.

116.   That in reliance of Defendant's representations, the Plaintiff utilized the Defendant's service to send funds to third-parties.

117.   That contrary to Defendant's assurance that it would not wrongly interfere with Plaintiff's fund transfers, the Defendant on or about July 25, 2007 did wrongly withhold Plaintiff's funds and had wrongly refused to release the funds to the Plaintiff after the Plaintiff requested that the Defendant release his funds.

118.   That the Plaintiff did not violate the Defendant's User-Agreement nor did the Plaintiff commit fraud.

119.   That the Defendant had no intentions of honoring its representations within its User-Agreement to the Plaintiff.

120.   That the Defendant represented to the Plaintiff that if he provided additional verification of his identify, the Defendant would release his funds.

121.   That the Plaintiff, having reliance on the Defendant's statements, provided the additional verification requested by the Defendant.

122.   That the Defendant had no intentions of honoring its representations to the Plaintiff that it would release his funds if he provided the requested verification.

123.  That after the Plaintiff provided the Defendant with the requested verification; the Defendant did fail to release the Plaintiff's funds and had continued to refuse to release such funds to the Plaintiff.

124.  That once the Plaintiff filed a lawsuit in New York State against the Defendant, the Defendant deposited the Plaintiff's funds back into his bank account at Wachovia Bank via the Plaintiff's debit card ending in …9024.

125.  That the Defendant had wrongly converted the interest earned from the Plaintiffs money within the Defendant's pooled bank account to its own use.

126.  That at the time the Defendant had entered into contract with the Plaintiff, it had knowledge that its anti-fraud detection software could create a false positive against the Plaintiff and interfere with Plaintiff's fund transfers; but the Defendant intentionally and maliciously failed to disclose this fact to the Plaintiff to induce him to enter into contract with it and to use its money transfer service without restraint.

127.  That the Defendant's anti-fraud detection software did create a false positive and did wrongly interfere with the Plaintiff's funds by blocking the Plaintiff's account and freezing his funds.

128.  That the Defendant did refuse to release the Plaintiff's funds to his business associate, Eric Anderson.

129.  That due to the Defendant's fraudulent misrepresentation, the Plaintiff has suffered general and special damages.

130.  By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SECOND CAUSE OF ACTION
(Fraudulent Concealment)

131.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 130 with the same force and effect as if more fully set forth herein.

132.   That the Defendant did represent to the Plaintiff within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

133.   That the Defendant had knowledge of the falsity of its representations within its User-Agreement that it would not interfere with the Plaintiff's money transfers without good cause.

134    That the Defendant did intentionally and maliciously conceal material facts concerning false positives and the dangers associated with them from the Plaintiff, which could have and did interfere with the Plaintiff's money transfers without good cause.

135.   That the Defendant intentionally and maliciously concealed false positives and the dangers associated with them from the Plaintiff to gain the Plaintiff's reliance on its representations within its User-Agreement that it would not interfere with the Plaintiff's money transfers without good cause.

136.   That the Plaintiff had reliance on the Defendant's representations within its User-Agreement due to its well-known and dominant position within the market.

137.   That in furtherance of its concealment of false positives, the Defendant fabricated good cause for blocking the Plaintiff's account and freezing his funds by defaming the Plaintiff to his business associate, Eric Anderson.

138.   That due to the Defendant's fraudulent concealment, the Plaintiff suffered general and special damages.

139.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

140.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 139 with the same force and effect as if more fully set forth herein.

141.   That the Defendant did represent to the Plaintiff within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

142.   That the Defendant had knowledge of the falsity of its representations within its User-Agreement that it would not interfere with the Plaintiff's fund transfers without good cause.

143.   That the Defendant did intentionally and maliciously conceal material facts concerning false positives from the Plaintiff for the purpose of inducing the Plaintiff to enter into contract with it and to use its money transfer service without restraint.

144.   That the Plaintiff had reliance on the Defendant's representations due to its well-known and dominant position within the market.

145.   That due to the Defendant's fraudulent inducement, the Plaintiff has suffered general and special damages.

146.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

147.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 with the same force and effect as if more fully set forth herein.

148.   That the Defendant had a superior knowledge of false positives and the dangers associated with them, and thus, had a duty to disclose this fact to the Plaintiff prior to him agreeing to its User-Agreement.

149.   That the Defendant made a false representation within its User-Agreement that the Defendant would not interfere with the Plaintiff's money transfers without good cause that it should have known was incorrect because the possibility that the Plaintiff could have been victimized by a false positive and his funds automatically frozen by its anti-fraud detection software was foreseeable.

150.   That the Defendant had knowledge that the representations made within its User-Agreement would be relied on by the Plaintiff in deciding whether to agree to such User-Agreement.

151.   That the Plaintiff did have reliance on the representations made in the Defendant's User-Agreement, which caused the Plaintiff to agree to the Defendant's User-Agreement.

152.    That due to the Plaintiff's reliance on the Defendant's false representation within its User-Agreement, the Plaintiff was prevented from taking steps to protect himself and was eventually harmed.

153.   That due to the Defendant's negligent misrepresentation, the Plaintiff has suffered general and special damages.

154.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

### FIFTH CAUSE OF ACTION
(Defamation)

155.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 154 with the same force and effect as if more fully set forth herein.

156.   That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone.

157. That the Defendant made intentional and malicious false statements to Eric Anderson that the Plaintiff defrauded someone for the purpose of fabricating good cause for blocking Plaintiff's account and freezing his funds.

158. That the Defendant knew at the time it made such statements to Eric Anderson that those statements were false.

159. That the Defendant did, with intent and malice, make false statements to Eric Anderson with full knowledge that the Plaintiff would be defamed and his reputation would be damaged.

160. That the Defendant did make false statements to Eric Anderson with reckless disregard as to the truth of the statements and whether the statements defamed the Plaintiff.

161. That Eric Anderson did have reliance on the Defendant's statements due to its well-known and dominant position within the market.

162. That due to the Defendant's defamatory statements to Eric Anderson, the Plaintiff suffered general and special damages.

163. By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## SIXTH CAUSE OF ACTION
(Defamation Per Se)

164. That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 163 with the same force and effect as if more fully set forth herein.

165. That the Defendant made intentional, malicious and defamatory statements against the Plaintiff to Eric Anderson that the Plaintiff defrauded someone.

166. That the Defendant made intentional, malicious and defamatory statements against the Plaintiff to Eric Anderson that constitutes a violation of California's Penal Code § 484.

167.    That the Defendant knew, at the time it made the statements to Eric Anderson, they were false.

168.    That the Defendant did, with intent and malice, make such false statements to Eric Anderson in its attempt to create good cause for blocking Plaintiff's account and freezing his funds.

169.    That the Defendant did act negligently in failing to learn whether the statements made to Eric Anderson were false and defamed the Plaintiff prior to making such statements.

170.    That the Plaintiff suffered embarrassment, humiliation, outrage and extreme distress due to the Defendant's defamatory statements against him to Eric Anderson.

171.    That due to the Defendant's defamatory statements to Eric Anderson accusing the Plaintiff of committing a crime, the Plaintiff has suffered general and special damages.

172.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).


### SEVENTH CAUSE OF ACTION
(Conversion)

173.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 172 with the same force and effect as if more fully set forth herein.

174.    That the Defendant did wrongly gain possession of the Plaintiff's funds.

175.    That the Defendant did wrongly refuse to forward Plaintiff's funds to Plaintiff's business associate, Eric Anderson.

176.    That the Defendant did wrongly refuse to return Plaintiff's funds after Plaintiff requested such funds from the Defendant.

177.    That the Defendant did wrongly convert Plaintiff's interest payments to its own use, and has refused to release such interest to the Plaintiff after the Plaintiff requested its release.

178.    That due to the Defendant's wrongful conversion of the Plaintiff's interest payments to its own use, the Plaintiff has suffered general damages.

179.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## EIGHT CAUSE OF ACTION
(Tortious Interference with Business Relationship)

180.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 179 with the same force and effect as if more fully set forth herein.

181.    That the Plaintiff did have an economic relationship with his business associate, Eric Anderson, which gave the Plaintiff a benefit valued at SEVENTEEN THOUSAND AND THIRTY EIGHT DOLLARS ($17,038.00).

182.    That the Defendant did have knowledge of the economic relationship between the Plaintiff and his business associate due to the fact the Defendant was in possession of a copy of the contract between the Plaintiff and Eric Anderson while the Defendant was in possession of the Plaintiff's funds.

183.    That the Defendant did with intent and malice interfere with Plaintiff's business relationship with his business associate by failing to forward the Plaintiff's funds to Eric Anderson and false accusing the Plaintiff of fraud.

184.    That the Defendant did with reckless disregard interfere with Plaintiff's business relationship with his business associate by failing to forward the Plaintiff's funds to Eric Anderson and falsely accusing the Plaintiff of fraud.

185.    That due to the Defendant's interference, the Plaintiff's contract and business relationship with his business associate, Eric Anderson, was terminated, and the Plaintiff lost the contract benefit of SEVENTEEN THOUSAND AND THIRTY EITGHT DOLLARS ($17,038.00).

186.   That due to the Defendant's tortious interference with the Plaintiff's business associate Eric Anderson, the Plaintiff has suffered general and special damages.

187.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

188.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 187 with the same force and effect as if more fully set forth herein.

189.   That due to the Defendant's intentional acts against the Plaintiff, the Plaintiff has suffered extreme emotional distress.

190.   That the Plaintiff began to suffer emotional distress on or about July 25, 2007 when the Defendant wrongly withheld ONE THOUSAND NINE HUNDRED AND FIFTY DOLLARS ($1,950.00) of the Plaintiff's money that was meant as payment on two (2) third-party contracts.

191.   That the Plaintiff began to suffer extreme emotional distress on or about August 6, 2007 when the Defendant falsely accused the Plaintiff of committing a crime to his business associate, Eric Anderson.

192.   That the Defendant had actual knowledge or should have known that Plaintiff's emotional distress would be the likely result of its conduct.

193.   That the Defendant's conduct in wrongly withholding Plaintiffs fund's and then falsely accusing him of committing a crime to his business associate, Eric Anderson, was extreme and outrageous.

194.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## TENTH CAUSE OF ACTION
(Violation of Cal. Civil Code §§ 17200
unlawful, Unfair and Fraudulent Business Practices)

195.   That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 194 with the same force and effect as if more fully set forth herein

196.   That the Defendant's false representations within its contract pertaining to its interference of Plaintiff's fund transfers and its concealment of a material fact concerning false positives, which were meant to induce the Plaintiff to enter into contract with it and to utilize its money transfer service without restraint constitutes a deceptive trade practice under Cal. Civil Code §§17200.

197.   That California's Consumer Remedies Act creates a private right to take legal action by any person who has been harmed from the Defendant's violation of Cal. Civil Code §§ 17200.

198.   That the Defendant's false representations within its contract and the concealment of false positives has deceived the Plaintiff and millions of other consumers who have been injured by the Defendant's deceptive practices. Furthermore, the Defendant is continuing to deceive millions of other consumers to induce them to enter into contract with it and to use its money transfer service without restraint.

199.   That the Defendant intentionally devised a scheme to manage the millions of false positives produced by its anti-fraud detection software, and in doing so, the Defendant has been reaping a financial benefit to the detriment of consumers.

200.   That due to the Defendant's deceptive trade practices, the Plaintiff and other consumers have suffered general and special damages.

201.   By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

## ELEVENTH CAUSE OF ACTION
(Violation of the Rico Act, 18 U.S.C. §§ 1961)

202.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 201 with the same force and effect as if more fully set forth herein.

203.    That the defendant violated the RICO Act by engaging in two or more criminal acts as described under 18 U.S.C. §1962 (Prohibited activities) against the Plaintiff and other consumers throughout the United States.

204.    That the Defendant devised a scheme to manage millions of false positives by concealing the false positives from the Plaintiff and other consumers while reaping financial benefits to the Plaintiff's and consumers' detriment.

205.    That the defendant committed a pattern of criminal acts as part of its scheme to conceal false positives and the dangers associated with them from the Plaintiff and millions of consumers.

206.    That in furtherance of its scheme, the Defendant fabricated good cause in blocking the Plaintiff's and other consumers' accounts and freezing their funds.

207.    That in furtherance of its scheme, the Defendant wrongly converted to its own use the interest payments earned from the Plaintiff's funds and from the funds of other consumers that were held in the Defendant's pooled bank accounts when it had knowledge that they were victims of a false positive.

208.    That in furtherance of its scheme, the Defendant wrongly charged Eric Anderson and other consumers' chargeback and reversal fees when it had knowledge that they were victims of a false positive.

209.    That the Defendant is continuing its fraudulent scheme with other consumers and it is wrongly continuing to convert consumers' interest payments to its own use and it is continuing

to charge fees for chargebacks and reversals when it has knowledge that such consumers were victims of a false positive.

210. That the Defendant repeatedly engaged in this fraudulent scheme against the Plaintiff and other consumers and continues to engage in this fraudulent scheme by utilizing electronic communications (email and telecommunications), which constitutes wire fraud pursuant to 18 U.S.C. § 1343.

211. That in furtherance of its fraudulent scheme, the Defendant utilized electronic communications by posting a User Agreement on its website at www.Paypal.com to the Plaintiff and millions of other consumers that was and still is devoid of any mention of false positives and the dangers associated with them.

212. That on July 31, 2007, and in furtherance of its scheme, the Defendant did have its customer service employee, Rene, utilize telecommunications in California to falsely inform the Plaintiff in New York that his account was blocked and his funds frozen due to a past due balance of $695.00 when, in fact, the Plaintiff's account was blocked and his funds frozen due to a false positive created when Eric Anderson transferred the Plaintiff's funds out of the Defendant's pooled bank account, and upon information and belief, the right to the $695.00 debt had previously been sold by the Defendant to a collection agency.

213. That on August 6, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California in the form of an email sent to Eric Anderson in Illinois that falsely informed Eric Anderson that the Plaintiff's funds were fraudulent, that the Defendant conducted an investigation, which concluded the Plaintiff's funds were "indeed" fraudulent and that the Defendant had to give the funds back to the person the Plaintiff stole them from.

214. That on or about July 25, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California to New York in the form of an email and falsely informed Web Scribble Solutions, Inc. why the Plaintiff's funds were frozen.

215.    That on or about July 25, 2007, and in furtherance of its scheme, the Defendant did utilize electronic communications from California in the form of an email sent to the Plaintiff in New York, which falsely informed the Plaintiff that if he submitted additional verification of his identity, the Defendant would release his funds.

216.    That in furtherance of its scheme, the Defendant has and continues to utilize electronic communications to falsely inform other consumers throughout multiple States within the United States that if they submit additional verification of their identity, their funds would be released.

217.    That in furtherance of its scheme, the Defendant concealed false positives and the dangers associated with them from the Plaintiff and millions of other consumers to induce them to enter into contract with it and to use its money transfer service without restraint.

218.    That the Defendant has utilized the ill-gotten financial gains from its fraudulent scheme to invest in other companies. Specifically, the Defendant used the ill-gotten financial gains to acquire Fraud Sciences, a private overseas company.

219.    That as a corporation, which repeatedly engaged in a pattern of fraud over multiple years against the Plaintiff and other consumers and continues to engage in a pattern of fraud against other consumers as described above, the Defendant is considered to be an enterprise pursuant to 18 U.S.C. §1961(4) that has violated the RICO Act and is continuing to violate the RICO Act as defined by federal law pursuant to 18 U.S.C. § 1961(1).

220.    That due to the Defendant's fraudulent scheme, the Plaintiff has suffered both general and special damages.

221.    By reason of the foregoing, Plaintiff has suffered damages in the amount of TEN MILLION DOLLARS ($10,000,000.00).

**Wherefore**, Plaintiff demands a jury trial and prays for judgment against the Defendant as follows:

1) Liability against the Defendant, and

2) Rescind the defendant's contract, and

3) Enjoin the defendant from further withholding Plaintiff's interest payments, and

4) Enjoin the defendant from further concealing false positives and the dangers associated with them from all consumers, and

5) Enjoin the defendant from using any damaging words such as "suspicion of fraud", "suspicious activities" or "fraud" within any consumer communications prior to a valid investigation being concluded, and

6) Compensatory damages, consisting of general and special damages, in the amount of TEN MILLIONS DOLLARS ($10,000,000.00), and

7) Treble damages against the defendant, and

8) Punitive damages against the Defendant in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00), and

9) Costs and for such other and further relief as this Court deems just and proper.

Dated: New York, NY
      May 19, 2008

B. David Mehmet
Plaintiff

To: Mr. Oleg Cross
    Cooley Godward Kronish, LLP.
    4401 Eastgate Mall
    San Diego, CA  92121
    (858) 550-6000
    (858) 550-6420

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

B. David Mehmet,

      Plaintiff,

      -against-

Paypal, Inc.

      Defendant.

Civil Case No. 5:08-01961 (RS) (RMW)

**VERIFICATION OF COMPLAINT**

I, Badisse David Mehmet, declare:

1. I am the Plaintiff in the above captioned matter. Amended

2. I verify that the foregoing Verified Complaint was duly prepared by me and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3. I declare under the penalty of perjury that the foregoing is true and correct.

Executed in New York, N.Y. on May 19th, 2008.

**ON THIS DAY OF** _May, 19th_ **IN THE YEAR OF 2008, THE ABOVE SIGNED PERSON BADISSE DAVID MEMET PERSONALLY KNOWN, WHO, BEING DULY SWORN, DID EXECUTE THE FOREGOING VERIFICATION AND DID SO AS HIS FREE ACT AND DEED. IN WITNESS WHEREOF, I HEREUNTO SET MY HAND AND OFFICIAL SEAL**

**NOTARY**

Respectfully submitted,

B. David Mehmet
Plaintiff
130 Church Street, Ste 251
New York, NY 10007
Telephone: (212) 920-7602
Facsimile: (212) 387-9387
Email: David@AppellateTerm.com

JEAN-PAUL GRECZI
Notary Public, State of New York
No. 01GR6119330
Qualified in Queens County
Commission Expires November 29, 2008